138 N.J. Super. 137 (1975)
350 A.2d 292
ABEL HOLDING CO., INC., PLAINTIFF,
v.
AMERICAN DISTRICT TELEGRAPH COMPANY AND THE NEW JERSEY BELL TELEPHONE COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 10, 1975.
*141 Mr. Franklin M. Sachs for plaintiff (Messrs. Podvey & Sachs, attorneys).
Mr. Burtis W. Horner for defendant American District Telegraph Company (Messrs. Stryker, Tams & Dill, attorneys).
Mr. Lewis B. April for defendant New Jersey Bell Telephone Company (Messrs. Cooper, Perskie, Neustadter & Katzman, attorneys).
HORN, A.J.S.C.
Various pretrial motions in the above action are before me for determination. They include motions for summary judgment as well as dismissal of the complaint. The precise nature and the grounds for the motions are recounted with respect to each.
The events leading to this litigation are related as follows. Plaintiff Abel Holding Co. (Abel), until recently the owner of the Steel Pier in Atlantic City, commenced this *142 action against each defendant to recover for its property damage and for loss of profits allegedly suffered as a result of the occurrence of a large conflagration on the pier on December 27, 1969, at which time the pier was closed. The theories of recovery are negligence, breach of contract, breach of express and implied warranties, and strict liability in tort.
Steel Pier on the date of and prior to the fire was operated as an amusement pier with numerous attractions which in the summer season attracted many thousands of visitors. The pier is basically a structure consisting of wooden decking supported by pilings, with various buildings thereon and extending into the Atlantic Ocean on the southerly side of the boardwalk. A ballroom was situate at the ocean end of the pier.
In or prior to 1955 Grinnell Corporation, under contract with Abel, installed a sprinkler system consisting of a "wet system" and a "dry system" on various portions of the pier. The dry system is the most extensive and is the one which is concerned in this action. The dry system consists of pipes or conduits filled with air contained under a sufficient amount of pressure so as to hold a water seat in position to prevent the flow of water at normal city water pressure from going up through the sprinkler pipes. Each sprinkler head is set to fuse at a particular temperature. When that temperature is reached the head breaks, allowing the air within the system to escape, thereby reducing the pressure on the water seat to a point where the pressure of the water beneath the seat becomes greater than the amount of air pressure in the system, and the water then flows through the system and out of the pipes.
In 1955 American District Telegraph Co. (ADT) was a subsidiary of the Grinnell Corporation and sold to plaintiff its "direct-connected protection signaling system." The purpose of the system, as set forth in numerous advertisements, was to safeguard life, property and profits. The signaling system had two purposes: (1) to monitor and supervise the air pressure in the dry system, and (2) to instantly signal *143 the fire department upon the flow of water into the dry pipes upon the fusing of the sprinkler heads.
In effect, ADT's installation was designed to signal the fire department of the smallest possible fire, since the sprinkler heads were located throughout the entire pier, no more than a few feet apart.
The initial contract with ADT provided that the latter would install and maintain a protective signaling system, directly connected from the pier to the Atlantic City Fire Department. ADT connected its signalling device on the pier to the fire department through a pair of wires leased from defendant New Jersey Bell Telephone Company (Telephone Co.). The wires went from the pier to the central office of the telephone company, and thence to the Atlantic City Electrical Bureau, the communication center of the fire department.
When the fire occurred on the pier on December 27, 1969 it caused water to flow through the dry sprinkler system at approximately 5:45 P.M. The system operated when a waterflow signal was indicated at the pass-gate guard office. The alarm should have been automatically transmitted from the pier when the fire occurred. However, it is indicated that the alarm signal was never received at the Atlantic City Electrical Bureau because of a pre-existing manually-caused defect in the system's circuitry inside the telephone company's central office. As a direct result of this failure the fire department was not notified of the existence of a fire on the pier until approximately 6:09 P.M., about 24 minutes later. When the fire reached the extent that it burned through the front wall of the ballroom at the end of the pier it was seen by a police officer who was some 2,000 feet away. The officer's telephone call to the fire department was its first notice of the occurrence of the fire.
As already stated, the first contract for the alarm system between Abel and ADT was made in 1955. In 1963 a similar contract for an additional time was executed. The third contract, *144 and the one which was in existence when the subject fire took place, was made on May 15, 1969.
The 1955 and 1963 contracts contained the following clause:
8. It is agreed by and between the parties hereto: that the contractor is not an insurer: that the payments heretofore named are based solely on the value of the service provided for herein: that, from the nature of the services to be rendered, it is impracticable and extremely difficult to fix the actual damages, if any, which may proximately result from a failure on the part of the contractor to perform any of its obligations hereunder: that, in case of the failure of the contractor to perform any of its obligations hereunder, and resulting loss to the subscriber, the contractor liability hereunder shall be limited to and fixed at a sum equal to ten percent of the annual service charge, hereinabove provided for, but in no event amounting to less than the sum of $50, as liquidated damages, and not as a penalty, and this liability shall be exclusive.
The annual charge to Abel under all three contracts was $1744.
The 1969 contract was substantially the same as the earlier agreements, except that in lieu of the above-quoted clause it contained the following:
It is understood that the Contractor is not an insurer, that insurance, if any, shall be obtained by the Subscriber and that the amounts payable to the Contractor hereunder are based upon the value of the services and the scope of liability as herein set forth and are unrelated to the value of the Subscriber's property or the property of others located in Subscriber's premises. The Subscriber does not desire this contract to provide for full liability of the Contractor and agrees that the Contractor shall be exempt from liability for loss or damage due directly or indirectly through occurrences, or consequences therefrom, which the service is designed to detect or avert; that if the Contractor should be found liable for loss or damage due to a failure of service in any respect, its liability shall be limited to a sum equal to ten percent of the annual service charge or $250, whichever is the greater, and that the provision of this paragraph shall apply if loss or damage, irrespective of cause of origin, results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract or from negligence, active or otherwise, of the Contractor, its agents or employees. The Department or other organization to which the connection is made may invoke the provisions *145 thereof against any claims by the Subscriber due to any failure of such department or organization.

I
The first issue with which I will deal is the motion for summary judgment made in behalf of ADT. This motion is founded upon assertions that the record before the court, consisting of the pleadings and depositions, conclusively establishes that the fault which resulted in the failure of transmission of the alarm signal was exclusively that of Telephone Co. In effect, ADT advances the thesis that the failure of its contractor or subcontractor to contractually perform raises an absolute defense as against Abel.
ADT furnishes no legal authority for this proposition. I know of no law which excuses a contractor from performing a contract by virtue of his unilateral engagement of a third person to perform. One owing a primary duty to exercise reasonable care may not exonerate himself by a delegation of the duty to a third person. 4 Corbin on Contracts, § 865 at 436 (1951). See also, Gill v. Krassner, 11 N.J. Super. 10 (App. Div. 1950); Sebeck v. Plattdeutsche Volkfest Verein, 64 N.J.L. 624 (E. & A. 1900). Accordingly, I find that this contention is without merit.

II
I now turn to ADT's contention that plaintiff should be limited by the provision in the contract allowing recovery of the greater of 10% of the annual service charge or $250.
This contention is based on the above-quoted clause as it appeared in the 1969 contract. Plaintiff submits that the subject clause is invalid as a matter of public policy. In addition, it urges that it should be abrogated by the court because allegedly it was the product of grossly unequal bargaining power and is unconscionable under the circumstances surrounding the execution of the agreement.
*146 The law in New Jersey respecting the validity of exculpatory clauses is fairly well settled. Justice Jacobs summarized it in Mayfair Fabrics v. Henly, 48 N.J. 483 (1967), when he said:
Where they do not adversely affect the public interest, exculpatory clauses in private agreements are generally sustained. Globe Home Improvement Co. v. Perth Amboy, etc., Inc., 116 N.J.L. 168, 170 (E. & A. 1936). But where a party to the agreement is under a public duty entailing the exercise of care, he may not relieve himself of liability for negligence through an exculpatory clause; illustrative are common carriers, public utilities, and the like. See Horelick v. Pennsylvania R. Co., 13 N.J. 349, 357 (1953); 6A Corbin, Contracts, § 1472 (1962); cf. McCarthy v. National Association for Stock Car Auto Racing, Inc., 48 N.J. 539 (1967). Similarly, in other situations where there is unequal bargaining power, the public interest may call for rejection of an exculpatory clause exacted by the dominant party; illustrative are Kuzmiak v. Brookchester, 33 N.J. Super. 575 ([App. Div.], 1955), where the Appellate Division dealt with a lease signed by residential tenants in an apartment building, and Tunkl v. Regents of University of California, 60 Cal.2d 92, 32 Cal. Rptr. 33, 383 P.2d 441 (1963), where the California Supreme Court dealt with an instrument signed by a patient on his admission to a charitable research hospital. See 52 Calif. L. Rev. 350 (1964); 6 Williston, Contracts § 1751, (Rev'd ed. 1938, Supp. 1966); cf. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 396-397 (1960). [at 487]
Disclaimers or limitations of liability are not favored. Henningsen v. Bloomfield Motors, Inc., supra, 32 N.J. at 373. Although provisions against liability for negligence found in leases or other types of contracts are to be strictly construed, where the terms of a writing are plain and unambiguous there is no room for construction, since the only office of judicial construction is to remove doubt and uncertainty. Midland Carpet Corp. v. Franklin Assoc. Properties, 90 N.J. Super. 42, 46 (App. Div. 1966).
Judge Kolovsky, in Midland Carpet Corp. at 47 stated: "However, in the case of a lease of industrial property, * * * no such inequality of bargaining position exists; the exculpatory provisions of such a lease are normally valid and enforceable." See also, Mayfair Fabrics v. Henley, 97 N.J. *147 Super. 116 (Law Div. 1967), aff'd sub nom. Natell v. Henley, 103 N.J. Super. 161 (App. Div. 1968).
In Midland Carpet Corp. it was also observed that (90 N.J. Super. at 47) another facet of the same principle pertaining to exculpatory clauses exists in the case of indemnification agreements in building and construction contracts, where parties engaged in commercial or industrial enterprises bargain with respect to the allocation of liability for risks arising out of their contractual relationship, even though those risks stem from negligent conduct. Stern v. Larocca, 49 N.J. Super. 496, 501 (App. Div. 1958); Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117, 121 (App. Div. 1960); Rommell v. U.S. Steel Corp., 66 N.J. Super. 30, 42 (App. Div. 1961), certif. den. 34 N.J. 580 (1961); Buscaglia v. Owens-Corning Fiberglas, 68 N.J. Super. 508, 514 (App. Div. 1961), aff'd 36 N.J. 532 (1962).
Carbone v. Cortlandt Realty Corp., 58 N.J. 366 (1971), provides an example of the policy to strictly construe such exculpatory clauses against immunity for one's own negligence, even in a commercial transaction. In that case, because the exculpatory clause in a commercial lease did not clearly advert to landlord's negligence and there was no indication elsewhere in the lease of an understanding to immunize it from liability for its own negligence, the court held that the intention of the parties was a question of fact to be decided. Notwithstanding such construction of policy, the court in Carbone obviously reaffirmed the earlier policy that such clauses are not ipso facto invalid. The dissenting opinion presents a very potent argument against the soundness of the majority's ruling.
In Foont-Freedenfeld Corp. v. Electro-Protective Corp., 126 N.J. Super. 254 (App. Div. 1973), aff'd 64 N.J. 197 (1974), plaintiff was a manufacturer of women's apparel and operated its plant in Hoboken. Defendant was engaged in the business of designing, installing and maintaining burglar alarm systems. Pursuant to a written contract it installed such a system in plaintiff's premises. Following *148 two minor break-ins in April and June 1969, a major breakin occurred on June 27, 1969, which resulted in a substantial loss. Plaintiff instituted the action to recover that loss. The contract contained a clause substantially similar to the quoted eighth clause of the 1955 and 1963 contracts between Abel and ADT.
Concluding that the trial court properly found that the parties were in equal bargaining position and that plaintiff voluntarily entered into the contract with full knowledge of the clause and its effect, the Appellate Division held the subject clause to be a valid limitation of contractual liability under the existing circumstances. Defendant's liability was accordingly limited to $50.
In affirming, the Supreme Court observed that plaintiff had expressly disclaimed any contention that the aforementioned clause was arbitrary and unconscionable, and should be declared unenforceable as against public policy. It upheld the determination of the Appellate Division against the two contentions that were advanced by plaintiff  the pertinent one being that the clause was invalid because it was unrelated to actual damages and was therefore in the nature of a penalty provision.
In two California cases, Better Food Markets, Inc. v. American Dist. Tel Co., 40 Cal.2d 179, 253 P.2d 10 (Sup. Ct. 1953), and Atkinson v. Pacific Fire Extinguisher Co., 40 Cal.2d 192, 253 P.2d 18 (Sup. Ct. 1953), clauses similar to those in the 1955 and 1963 agreements between the instant parties were construed to limit the respective defendants' liability to the amount declared therein. In the first, involving a defective burglar alarm system, the court noted that the statutory law and its interpretation in California are in accord with the general law. Civil Code § 1670 states that a provision in a contract which provides for the amount of damages to be paid in the event of a breach of the contract is void, except as expressly provided in § 1671 as follows: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage *149 sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."
In sustaining the validity of the clause, the court said:
In the exercise of their business judgment the parties reasonably agreed that in all cases of breach by the defendant the damages would be fixed at $50 whether in fact the defendant's (sic) loss for a given breach was greater or less than that amount. As previously stated the stipulation that the amount was to be paid "as liquidated damages and not as a penalty" while entitled to some weight is not conclusive. Nevertheless, it is clear that the actual loss resulting from a breach could in many cases be less than the amount provided for. It is equally clear that in many other cases the actual loss would exceed that amount. To construe this as a penalty it would have to be said that the amount provided to be paid bore no reasonable relation to the loss that the parties thought might be sustained. This may not rightly be stated. [253 P.2d at 15]
Atkinson v. Pacific Fire Extinguisher Co., supra, involved a fire loss resulting in the owner of the premises seeking damages from defendant, which had installed an automatic fire detection system in plaintiff's planing mill under a lease which contained, as already stated, a clause similar to that one which appears in the 1955 and 1963 agreements between the parties to the instant action.
In upholding the validity of the limitation, the court observed that, as contended by defendant in that case, the jury could not properly have found that it was not impracticable or extremely difficult to fix actual damages, when viewed from the position of the contracting parties under all the circumstances of the case existing at the time the contract was executed. The detection system was intended to provide protection in case of a wide variety of fires. Some of them would be slow-burning, where a loss resulting from the failure of the detection system might be negligible. Other fires might result only in a pitted floor. Still others would immediately envelop the buildings in flames and result in a very substantial loss. Looking ahead, the parties had no way of knowing what type of fire might occur after a particular *150 failure of the detection system. The merit in defendant's contention, the court said, lies in the argument that in no event could the parties have predicted what portion of the loss at any particular fire would be the proximate result of the failure of the detection system. It is true that in the event the detection system was functioning properly there would probably be some damage by fire prior to the alarm; that further damage would have occurred before the fire-fighting equipment could have been put into operation, and that the fire may have been of such a nature that the planing mill would have been consumed. The uncertain extent to which losses might occur, viewed from the time of entering into the contract, would make the task of fixing damages an extremely difficult if not an impossible one.
The court further observed that:
For the small compensation received obviously it could not afford to assume responsibilities such as are assumed in the case of fire insurance coverage. On the other hand, while the plaintiffs could not and did not expect the defendant to furnish the security which fire insurance would afford, they were entitled to some compensation for the defendant's breach of contract although they had no way of knowing even the nature or the extent of the loss which might result after the defendant's breach. In view of the fact that neither party could foresee what the consequences of a breach would be, it was entirely reasonable for them to agree upon the stated amount which by the statute is then presumed to be the damages sustained because of a breach. [253 P.2d at 21]
It may be assumed that the reasoning in these two California cases accords with that of our Supreme Court which led to the affirmance in Foont-Freedenfeld Corp. v. Electro-Protective Corp., supra.
On the other hand, plaintiff seeks support for its position in Tunkl v. Regents of University of California, supra, 60 Cal. 2d 92, 32 Cal. Rptr. 33, 383 P.2d 441 and Melodee Lane Lingerie Co. v. American Dist. Tel. Co., 18 N.Y.2d 57, 271 N.Y.S.2d 937, 218 N.E.2d 661 (Ct. App. 1966). Tunkl involved an action by a hospital patient against a charitable hospital for negligence. Upon admission of the *151 patient, who subsequently died, he signed a form of release exonerating defendant "from any and all liability for the negligent or wrongful acts or omissions of its employees, if the hospital has used due care in selecting its employees." The court held that this exculpatory provision was proscribed by Civil Code § 1668, which states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."
Not unlike Mayfair Fabrics, supra, the court in Tunkl [32 Cal. Rptr. at 35, 383 P.2d at 443] stated: "The cases have consistently held that the exculpatory provision may stand only if it does not involve `the public interest.'" It cited for this statement 175 A.L.R. 8 (1948), wherein are collected in an extensive annotation the various cases. The court then proceeded to mention the characteristics of cases involving public interest, stating:
It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. [32 Cal. Rptr. at 37, 383 P.2d at 445]
The court held in the light of these criteria that the hospital-patient contract involved therein fell within the category *152 of the agreements affecting the public interest and was invalid.
In the second case, Melodee Lane Lingerie Co. v. American Dist. Tel. Co., supra, plaintiff as a tenant occupied the second floor of a loft building owned by defendant 970 Kent Avenue Corp. and managed by Grosfeld House. A sprinkler head located in the premises, which was covered by an alarm system under contract between the landlord and ADT, gave way, releasing water which damaged tenant's property. It sought to recover against the landlord, its manager and ADT. The trial court found that ADT was negligent in making repairs to the alarm system, which was designed to give warning of escaping water, and awarded damages to plaintiff against all defendants in the amount of $7,500. In addition it awarded damages of $56.10 to the landlord and the building manager against ADT.
The Appellate Division, 23 A.D.2d 739, 258 N.Y.S.2d 242, held that the negligence of all defendants was primary and consequently there could be no recovery over on any theory of implied indemnity; that the contract between ADT and Grosfeld House contained no express indemnity provision; that it was unnecessary to determine the effect of the clause in the ADT contract which limited liability to a sum not to exceed $50 or a sum equal to 10% of the then current annual service charge, whichever is greater. Because of a statute declaring to be void contracts exempting contractors from negligence as the result of work performed or services rendered in connection with real property, the Court of Appeals held that parties could still limit liability, provided there was a voluntary choice of obtaining full or limited liability by paying under a graduated scale of rates proportioned to the responsibility. Furthermore, "in the absence of statute, a contracting party such as ADT could exempt itself from the consequences of its own ordinary negligence if the language so specifies." (At 945-946 of 271 N.Y.S.2d, at 667 of 218 N.E.2d)
*153 The Court of Appeals upheld plaintiff's right to recover its damages, it not being a party to the contract (cf. Abel v. Telephone Co.). It held that the clause limiting ADT's liability to the landlord and building manager was invalid under the circumstances. See also, Annotation, "Validity, Construction and Effect of Provision of Lease Exempting Landlord or Tenant from Liability on Account of Fire," 15 A.L.R.3d 786 (1967).
In the light of our own court pronouncements and the facts of Tunkl and Melodee Lane Lingerie, supra, those cases are not persuasive. Tunkl did not involve a commercial transaction. A man was brought to the hospital in ill health and needing medical attention, and was practically compelled to submit to the agreement. Melodee Lane Lingerie was the product of statutory interpretation, but even so the court recognized the same rules prevailing in our own jurisdiction. Mayfair Fabrics v. Henley, Midland Carpet Corp. v. Franklin Assoc. Properties and Carbone v. Cortlandt Realty Corp., all supra. See also, Ciofalo v. Vic Tanney Gyms, 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (Ct. App. 1961).
Even under the criteria specified in Tunkl v. Regents of University of California, supra, the contract in the case at bar was not affected by a public interest. The business of supplying fire alarm systems has not been regarded by any reported case as one suitable for public regulation. It is not of a nature which obliges the operator to serve all comers. Hamilton, "Affectation with a Public Interest," 39 Yale L.J. 1089 (1930); Arterburn, "The Origin and First Test of Public Callings," 75 U. Pa. L. Rev. 411, 428 (1927), cited by the court in Tunkl, 32 Cal. Rptr. at 37, 383 P.2d at 445, n. 10. Although I would agree that such a fire alarm system constitutes service of importance to the public, that may likewise be said of many other businesses and is not of itself sufficient to warrant the elevation of the service to the category of being affected by a public interest.
*154 The record does not bear out the fact that ADT holds itself out as willing to perform its service for any member of the public who seeks it, and there is no indication that ADT possessed a decisive advantage of bargaining strength against any member of the public seeking its services.
Our Supreme Court in Mayfair Fabrics v. Henley, 48 N.J. 483 (1967), upheld such an agreement in substantially the same factual setting established in this case. Plaintiff's contentions that ADT's service is of prime importance because of danger to the patrons of the pier is just as applicable to employees of a tenant engaged in a manufacturing process. Mayfair Fabrics v. Henley, supra. It must be borne in mind that the clause does not exculpate ADT or limit its liability to those not parties to the contract. Courts have expressly rejected the contention that such clauses tend to encourage negligence. 175 A.L.R. 23, 28 (1948).
The numerous cases in our own State upholding contracts allocating the risk of loss for negligence are impressive on this point. Stern v. Larocca; Cozzi v. Owens Corning Fiber Glass Corp.; Rommell v. U.S. Steel Corp., and Buscaglia v. Owens-Corning Fiberglas, all supra.
I therefore come to the conclusion that the subject clause is not invalid on the basis that it affects the public interest.

III
Plaintiff avers that the clause is invalid because it was the product of unequal bargaining power between Abel and ADT, and is unconscionable.
In the discussion of this point I recognize that the considerations concerning contracts affected by public policy to a certain extent overlap in the overall consideration of the issue of unequal bargaining power and unconscionability. At the outset I disagree with plaintiff's assertion that the observation by our Supreme Court in the Foont-Freedenfeld case, supra  that plaintiff expressly disclaimed any contention *155 that the clause was arbitrary and unconscionable, and should be declared unenforceable as against public policy  was tantamount to a declaration that had such a claim been made it would have upheld it. All that can be taken from this statement is that the court would have considered such contentions, with the possibility that if the circumstances in the case warranted it, relief might have been granted on such basis.
Although it is recognized that freedom of contract is highly important, it is not such an immutable doctrine as to admit of no qualification Henningsen v. Bloomfield Motors, Inc., supra, 32 N.J. at 388, and in each case the court must weigh "the valued interest in freedom of contract" against countervailing factors. Mayfair Fabrics v. Henley, supra, 48 N.J. at 489.
The mere fact that a contract is somewhat harsh or unfair in its operation does not excuse performance, and the court cannot create contractual obligations which are not based on the expressed intention of the parties. The performance of promises agreed upon by parties may only be excused for reasons which the law deems just. Harker v. McKissock, 7 N.J. 323, 332 (1951), reh. den. 8 N.J. 230 (1951).
The record here shows that George Hamid, Sr. and George Hamid, Jr. were the principal officers of Abel. In addition to the Steel Pier the Hamids had other interests in amusement enterprises within the State. ADT is a large multi-national corporation, specializing in the installation of alarm systems.
In United States v. Grinnell Corp. 236 F. Supp. 244 (D.C.R.I. 1964), it was found that ADT did 73% of the business throughout the United States in "accredited" central-station alarm services and that it, with two other interlocked companies, all owned by Grinnell Corporation, controlled 87% of the central-station alarm business. The court held that the monopolistic practices of ADT were a violation of the Sherman Anti-trust Act and ordered divestiture of some of its holdings. The United States Supreme Court affirmed, 384 *156 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). It is to be noted that both courts in Grinnell referred to "central-station alarm services" and not other types, such as the type installed for Abel.[1]
An affidavit of George Hamid, Jr. states that within a year before the signing of the 1955 contract a fire on the boardwalk resulted in substantial damage to the front of the pier; that shortly thereafter an ADT representative visited him and represented to him and the then manager of the pier that they had a system which would avoid the kind of damage they had suffered in the recent fire by having an alarm go directly to the fire department as soon as a sprinkler was activated, and that this system was "fail-safe." The affidavit further states: "The only negotiation which I had with that salesman was related to the price ADT was going to charge for the installation of equipment and the yearly service charge for the service. We never discussed any other terms relating to the proposed service."
When the first contract arrived Hamid merely read the typed-in portions, particularly the price, and when he signed the agreement there was no negotiation whatsoever as to any terms. Subsequent extensions of the contract were either sent to him in the mail or were dropped off at his office for his signature.
On one occasion he requested that ADT install certain valves by which one could turn off a particular system. The only negotiation with respect to that was the price which *157 would be charged to install same. He avers that he never had any idea that ADT was offering him a fire-alarm service directly connected to the fire department and at the same time telling him that if the service failed the responsibility would be limited to $250. "The representatives of ADT had told me their system could not fail because it was a direct connection to the fire department. We never discussed, in any way, the responsibility of ADT if the system did fail."
The present contention was not founded upon misrepresentation, although I assume for the purpose of this motion Hamid's statements are true. The affidavit constitutes an admission that the Hamids never read the contract in full. The law is settled that in the absence of fraud one who does not choose to read a contract before signing it cannot later relieve himself of its burdens, Fivey v. Pennsylvania R.R. Co., 67 N.J.L. 627 (E. & A. 1902); Henningsen, supra, 32 N.J. at 386. This settled rule must fall before a determination that a contract was unconscionable or the product of unequal bargaining. However, the failure to read the contract is not a circumstance which may be considered in determining whether there were unequal bargaining positions, in the absence of a showing that ADT was instrumental in inducing Hamid not to read the contract in full.
Abel asserts that in purchasing the service it did not have the advantage of "shopping around" in order to strike the most favorable bargain. Apart from the fact that admittedly there was never any attempt to so shop around, the record is devoid of support for this conclusion. Rather, the opposite is true. According to the yellow pages of the Atlantic City Telephone Directory of 1969 there were 14 competing alarm services. It may reasonably be assumed that there were similar services so advertised in the interval between 1955 and 1969.
The Uniform Commercial Code, N.J.S.A. 12A:2-302, in part provides that if the court as a matter of law finds the contract or any clause of the contract to have been unconscionable *158 at the time it was made, relief may be granted.[2] Unconscionability is not defined, and the definition most commonly used is vague and unsatisfactory. It is that an unconscionable bargain is one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." Earl of Chesterfield v. Janssen, 2 Ves. Sr. 125, 28 Eng. Repr. 82 (1750); 18 A.L.R.3d 1305, 1307 (1968). In Williams v. Walker-Thomas Furniture Co., 121 U.S. App. D.C. 315, 350 F.2d 445, 18 A.L.R.3d 1297 (Ct. of App. 1965), dealing with a sales contract, the court said:
Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.
In Moreira Constr. Co., Inc. v. Moretrench Corp., 97 N.J. Super. 391 (App. Div. 1967), plaintiff sued defendant upon *159 a written contract under which defendant was to provide certain equipment, including pumps, on a rental basis. Plaintiff contended that the equipment was defective and not reasonably fit for its intended use, and that it relied upon defendant's representation that the pumps were in good working order when in fact they were not, as a result of which they broke down frequently.
In addition to denying plaintiff's allegations, defendant counterclaimed for monies for rent, material and services, and cited a clause in the contract that provided that the liability of the lessor to the lessee was expressly limited to the free replacement of defective parts of the equipment.
The trial judge struck out the clause on the ground that it was invalid as against public policy. The jury found a verdict for plaintiff. The judge then ordered a new trial as to all issues, concluding that it had erred in holding the subject clause to be invalid. During the new trial he directed a verdict in defendant's favor. An appeal followed and the Appellate Division affirmed, upholding the validity of the subject clause. In so doing the court distinguished Henningsen v. Bloomfield Motors, Inc., supra, which the plaintiff relied on, from the case before it. As in the instant case, plaintiff in Moreira testified that the above clause was never brought to his attention nor read by him. However, the court responded only by saying that absent fraud, one who does not choose to read a contract before signing it is nevertheless bound by its terms.
In holding Henningsen to be inapplicable, the court said that it was a case "which dealt with a manufacturer and an ordinary layman," as compared with two corporations in a commercial setting. With respect to the fact that the clause was contained in the printed agreement proffered by defendant, it noted that the clause used in Henningsen was a standardized one used throughout the automotive industry, 32 N.J. at 390, thus leaving the consumer with no alternative but to accept the terms of the contract as stated. In the case at bar, as in Moreira, supra, there was evidence that there *160 were competitors of the defendant in the area "and there was no showing that plaintiff was precluded from negotiating a contract on more favorable terms," although defendant was the world's largest wellpoint company.
The record before me shows that the real party in interest is the insurance company which covered Abel for this loss and which has already made payment to Abel. Cf. Mayfair Fabrics v. Henley, 101 N.J. Super. 363 (Law Div. 1968). Cf. Wyckoff Tp. v. Sarna, 136 N.J. Super. 512 (App. Div. 1975).
Abel was not prevented from bargaining for an agreement different from that which it signed. It obviously was unconcerned with ADT's contractual obligations other than to furnish the alarm system. It never sought a better bargain. It had the coverage that it wanted. In short, it apparently was satisfied with being paid by its insurance carrier(s) if there was a fire.
Nor can the real party in interest, ADT's insurance carrier, complain. It was paid a premium commensurate with the risk, with full knowledge that its subrogation rights rose no higher than those of Abel. Woodbridge Tp Bd. of Ed. v. Kane Acoustical Co., 51 N.J. Super. 319 (App. Div. 1958); Foster Estates, Inc. v. Wolek, 105 N.J. Super. 339 (App. Div. 1969); Mayfair Fabrics v. Henley, supra, 101 N.J. Super. 363, 368 and 369, and Capece v. Allstate Ins. Co., 86 N.J. Super. 462 (Law Div. 1965). In the commercial world in which the parties in this case moved it may be assumed that not alone was Abel satisfied but the insurance companies were aware of the terms of the contract between Abel and ADT. At the very least it is difficult to conceive that no attention was given to the possible subrogation limitations.
Consequently, I find no unconscionability with respect to the clause in question nor such a lack of bargaining position on the part of plaintiff as should elicit relief with respect to the clause in question.

*161 IV
ADT also moves for summary judgment on its crossclaim for indemnification as against Telephone Co. Its assertion that the signal failure was attributable to a defect in the telephone lines is not controverted.
Telephone Co. does not appear to defend against this contention; rather, its argument is confined to opposing the right on the part of Abel to recover against it.
Since, factually, it seems to be agreed that the alarm failure was the result of a telephone line defect, I agree with ADT that it is entitled to indemnification as a matter of law for such amount as may be entered against it in behalf of Abel, subject to the effect of Telephone Co.'s filed tariff referred to hereinafter, which is not presently an issue before me. Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55 (1960).

V
I now turn to the motion of Telephone Co. which prays for an order: (1) dismissing the complaint as against it; (2) dismissing the claim of loss of profits; (3) entering judgment against it solely as to the issue of damages within limitation of damage clause (limitation of liability clause) in the contract between Abel and ADT; (4) determining that tariffs on file with the Public Utility Commission of the State of New Jersey are the controlling law, and (5) dismissing the claims of breach of warranty and strict liability asserted in plaintiff's complaint as same relate to the telephone company.
The facts are clear that the telephone company was not a party to the agreement between Abel and ADT which contains the limitation of liability clause. However, the telephone company contends that the language of that clause should be so construed that the benefit of same is to be accorded to it. Specifically, the pertinent portion of the clause is: "The Department or other organization to which the *162 connection is made may invoke the provisions hereof against any claims by the Subscriber due to any failure of such Department or organization."
I disagree. The contract provides for ADT to install on the premises "a Direct-Connected Protective Signaling System * * * connected to Atlantic City Fire Department." The exhibits show that Abel and ADT entered into the same form of contract in providing a similar system connection to the Atlantic City Police Department as part of a burglar alarm service. Hence the wording of the agreement is broad enough to require a minimum of change in the forms so used.
In the context of the entire agreement it is clear and unambiguous that the "connection" referred to in the pertinent clause is the "system" connection and not individual component connections within the system. "Department or other organization" means the fire or police department or similar organizations as they may be known in various political districts. As stated by ADT, the language would support Telephone Co.'s position if it read: "Department or other organization through which the connection is made." In any event, the language does not support Telephone Co.'s contention on this point.
Telephone Co. also urges that notwithstanding any other considerations, the subject clause nevertheless is a valid expression of an intention that Abel should look to its own insurance for damages resulting from fire, rather than to ADT or Telephone Co. However, this argument cannot be supported by logic. There is no evidence that Abel was aware of Telephone Co.'s part in the system. Even if it were, there is no indication that the scope of the pertinent clause was ever intended to apply to a stranger who paid no consideration for the benefit extended by the terms of the clause.
Cases cited by Telephone Co. in support of this argument are authority for upholding the limitation of liability insofar as ADT is concerned; but the proposition espoused by Telephone Co. is that its own liability is likewise curtailed. *163 Shaer Shoe Corp. v. Granite State Alarm, Inc., 110 N.H. 132, 262 A.2d 285 (Sup. Ct. 1970); Wedner v. Fidelity Security Systems, 307 A.2d 429 (Pa. Super. Ct. 1973), and Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416 (App. Div. 1971), all support ADT's position, but they go no further than that.
Mayfair Fabrics v. Henley, supra, 101 N.J. Super. at 369, held that a lease clause exculpating a tenant from liability to his landlord for damages resulting from fire likewise constituted a release of the tenant's employee whose negligence allegedly caused the fire. However, the principle of this case and the authorities cited therein cannot be extended to exculpate an independent contractor, as was Telephone Co.
Since Telephone Co.'s insistence that the same reasoning for limiting its liability is applicable to its claim that this court should dismiss the loss of profits issue, I conclude that the contention is untenable for the same reasons I assigned relative to that point.
Telephone Co.'s tariff contains the following limitation of liability: "The liability of the Telephone Company * * * shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay or error or defect in transmission occurs." It rests two of its points on this provision: first, that it constitutes a limitation of its liability to Abel as a matter of contract and/or as a matter of law, and, second, that because the tariff "talks only in terms of negligence and not in terms of warranty or trust [tort ?] liability" Abel's complaint must be limited to a recovery, if any, solely on the negligence theory and therefore the other theories of breach of warranty and strict liability in tort should be dismissed.
I find these suggestions to be untenable for several reasons. Primarily, the tariff is inapplicable to Abel. Tariffs may be considered as part of a subscriber's contract with a telephone company and may even be considered as law applicable *164 to the relationship between the utility corporation and the subscriber. Essex Cty. Welfare Bd. v. N.J. Bell Tel. Co., 126 N.J. Super. 417 (App. Div. 1974). But Telephone Co refers to no authority which holds that a filed tariff is binding upon a stranger to the relationship between the utility company and its subscriber, as is Abel in the case at bar. I know of no such authority and I know of no legal or other basis for so holding.
I have considered all other points of the parties and I do not find any of them to be meritorious.
Accordingly, appropriate orders reflecting these conclusions will be entered pursuant to the rules.
NOTES
[1] Under a central-station service hazard-detecting devices installed on the premises automatically transmit an electrical signal to a central station which is manned constantly. Upon receipt of a signal the central station, where appropriate, dispatches guards to the protected premises and notifies the police or fire department direct. "There are other forms of protective services. But the record shows that subscribers to accredited central station service * * * receive reductions in their insurance premiums that are substantially greater than the reduction received by the users of other kinds of protection service." United States v. Grinnell Corp., supra, 384 U.S. at 567, 86 S.Ct. at 1702.
[2] Of course, the Uniform Commercial Code is not applicable to the agreement in the case at bar. It is referred to only as illustrative of the law in the field of sales contracts as it may be applied to other agreements. N.J.S.A. 12A:2-102.