TREPS, Plaintiff-Respondent, v. CITY OF RACINE, Defendant-Appellant.

*No. 736 (1974).  Argued April 8, 1976.—Decided July 12, 1976.*
(Also reported in 243 N. W. 2d 520.)

For the appellant there was a brief by *Edward A. Krenzke*, city attorney, and *William F. Bock*, deputy city attorney, and oral argument by *William F. Bock*.

For the respondent there was a brief by *Donald C. Fellows* and *Wolfe, O'Leary, Kenney & Wolfe* of Milwaukee, and oral argument by *Donald C. Fellows*.

DAY, J.   The judgment appealed from is based on the court's finding that the city of Racine ("city") was negligent as a matter of law, and the jury finding that the plaintiff, John J. Treps, was not contributorily negligent. The case arose out of an accident in which Treps stepped into an open hole in the pavement of a parking lot in a city park, breaking his ankle.  Damages were assessed at a total of $21,907.71, and are not at issue

on this appeal. The principal issue on appeal is whether the trial court erred in taking the issue of the city's negligence from the jury. The city contends that the court applied the wrong standard of care under the law of licensee-invitee in effect at the time of the trial.[1] Secondly, the city argues that there was sufficient evidence of the city's lack of negligence to require the question to be submitted to the jury.

On June 4, 1971, plaintiff Treps testified he went to Douglas Park in the city of Racine to participate in a softball game as a member of a team belonging to a municipal league. He had been in Douglas Park in previous summers for several similar games, but this was his first visit there in 1971. He arrived between 7:30 p.m. and 7:45 p.m., and in walking to the end of the grandstand passed close to the hole in question. When additional players arrived, Treps and they moved to an adjoining parking lot area customarily used by waiting players to "warm up" by playing catch. After five or ten minutes, shortly after 8:00 p.m., a ball was thrown to Treps over his head; he stepped back and jumped to catch it. As he descended, his left foot entered a hole in the concrete pavement about two-feet deep. He sustained a broken ankle, suffering temporary and permanent disabilities.

The hole in the pavement, about ten inches by twelve inches in size, and two-feet deep, had been created by removal of a drinking fountain located near the point where the baseball field, parking lot, and sidewalk met. Treps testified that he had not noticed the hole that evening. However, there was sufficient light to play catch. One nearby player testified that he was not aware of the existence of the hole, but another who had been on Treps' immediate right testified that the hole was visible four to seven feet away from both of them, and that it

---

[1] This case arose before this court's decision in *Antoniewicz v. Reszczynski* (1975), 70 Wis. 2d 836, 236 N. W. 2d 1, abolishing the distinction between invitees and licensees.

was apparent to him that whatever covering was on the hole would not support a person's weight.

The principal question here concerns testimony about what the city did in repairing the drinking fountain hole. The testimony shows that the fountain had been removed from the parking lot in the fall of 1970 or in early 1971. The hole under the fountain contained a water meter and drain, and so was not completely filled in, but was covered by inserting a four-inch by four-inch timber supporting a three-quarter inch plywood board fitted into the hole, covered by an asphalt patching compound. This patch did not hold, and on April 12, the four-inch by four-inch plywood and asphalt process was repeated. The question is the status of the hole between April 12 and June 4, when Treps was injured.

Mr. Treps produced a number of witnesses who had observed the hole open at various times. A neighbor who lived across the street from the baseball diamond, whose three children played frequently in the park, testified that she had observed the hole very often, and that sometimes it was covered with a board and sometimes not. She testified that on June 3, the day before Treps' injury, she had almost stepped in it and saw that there was no covering at all. Three children from neighborhood families, ages 10 to 15, testified that the hole was constantly open during the spring of 1971. One of the children testified that she had observed it practically every day, that she used to step on a pipe in the hole under the ground, and that their dog would usually go there with neighborhood children and look into the hole. Another child testified that he and a playmate were in the park almost every day and used to dump gravel into the hole from toy trucks. He said there had been a "wood thing" on the hole "once or twice" but that it had not stayed there more than a week and had been removed from ten days to two weeks before the Treps accident. A

playmate corroborated his story. Another ballplayer testified that he had walked over to the hole earlier in the evening of June 4 expecting to find the drinking fountain there, and had found a completely uncovered hole; another witness, however, testified that the hole was partially covered while Treps was playing catch by slats of "an orange crate type," but not by a piece of plywood as referred to by other witnesses. Yet another ballplayer testified that there was no obstruction either on or in the hole at the time catch was being played.

A witness for the defendant city, Assistant Director of Parks Ferdinand Zimdars, testified that on June 1 he had walked across the concrete slab on which the drinking fountain had been located, and that the asphalt patch had been in place.

The board covering referred to by some of the witnesses was also mentioned by Frederick Schmidt, the park custodian, whose duties included general supervision of the park, and who admitted that he had paid specific attention to the drinking fountain hole because of the problem there. Mr. Schmidt testified in a deposition before trial that he had noticed the hole was open before Treps' injury, and had cut a piece of plywood to fit inside it on a "ledge" in the concrete. At this deposition he stated unequivocally that this piece of plywood had been there until after the accident, and that nobody could have stepped in the hole because there was no hole to step into. At trial, he repeated his story about the wooden cover, placing it "a matter of weeks" before June 4, but called it temporary repair and testified that, within a "couple of days" other city workers had put in a permanent asphalt patch.

Edward Stauss, a plumber-electrician who had moved the drinking fountain and had done the asphalt patching on both occasions, did not mention Schmidt's wooden

cover when describing his replacement of the first patch. He stated only that the original patch "had dropped through to the pit." Schmidt testified that the second asphalt patch had remained in place until the accident, and was subject to his daily supervision, and that he had observed the asphalt patch cover in place as he drove out of the parking lot while leaving work on June 4. He went on to testify that the asphalt cover had remained in place after the accident and to the day of trial, subject to his continuing supervision, and that he had not observed any barricades around the hole following the accident. Schmidt's testimony conflicts with the physical facts insofar as photographic exhibits show that the hole was covered with a steel plate at the time of trial. Mr. Stauss testified that after the accident he had cut the metal plate and had bolted it into place from underneath. This occurred immediately after the accident, while barricades were placed around the hole, according to Assistant Director of Parks Zimdars.

Mr. Zimdars also testified that after the accident, on June 7, he had observed the four-inch by four-inch post, the board, and fragments of asphalt in the bottom of the hole. He had previously testified on deposition that on June 4, immediately after the accident, he had observed that the asphalt patch was depressed about four or five inches: ". . . It had recessed probably because of vehicular traffic," but it was still in place. This deposition testimony was in direct conflict with the photographic evidence taken immediately after Treps' injury, which shows no part of the asphalt patch visible in the hole, and with the testimony of the police photographer to that effect.

There were other references in the testimony, besides Mr. Zimdars', to the fact that in the use of the area as a parking lot, vehicles may have passed over the site of the hole. Mr. Schmidt testified that he was aware of cars

traveling in this area, and that city trucks would at times pass over the hole.

At the close of the evidence, Mr. Treps' counsel moved that the court find the city negligent as a matter of law by answering the first two questions of the special verdict, concerning negligence and causation, in the affirmative. The plaintiff's motion was granted, the court finding that custodian Schmidt's testimony was incredible as a matter of law. The jury returned a verdict finding Mr. Treps not contributorily negligent.

The trial court treated Mr. Treps as a licensee, and in motions after verdict found that the hole was a "trap" within the meaning of the traditional limitation on liability of a licensor to plaintiffs injured by a concealed condition or a trap. We hold rather that Treps was an invitee to whom the city owed a duty of ordinary care, and that the evidence establishes as a matter of law that this duty was breached. Treps was using the facilities of the park for one of the uses that the park had been held open to the public. Treps falls within the classification of "public invitee" *i.e.,* one who goes upon lands for purposes for which those lands are held open to the public, regardless of whether the land owner derives any benefit from the presence of the invitee. 2 Restatement, *Torts* 2d, p. 176, sec. 332.[2] Prosser, *Law of Torts* (4th ed.), pp. 388–390, sec. 61.

Here, the duty of ordinary care would not be breached if the dangerous condition, to wit, the hole, were "open,

[2] "§332. Invitee Defined

"(1) An invitee is either a public invitee or a business visitor.

"(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

"(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."

unconcealed, and obvious," Wis J I—Civil 8020,[3] approved in *Smith v. Shuda* (1964), 22 Wis. 2d 629, 126 N. W. 2d 498; 2 Restatement, *Torts* 2d, p. 218, sec. 343 A.[4]

■■ We hold that this ten-inch by twelve-inch hole in an area where persons were known to play catch was not, as to Mr. Treps, an "open, unconcealed, or obvious" danger. It presented a hazard to persons playing catch which the city was under a duty to foresee. Prosser, *id.*, pp. 392, 393; *see also: Lee v. National League Baseball Club of Milwaukee* (1958), 4 Wis. 2d 168, 174, 89 N. W. 2d 811, 65 C. J. S., *Negligence*, pp. 743, 744, sec. 63 (46), and cases cited there. Permitting such hole to exist over the period of time testified to here was, as a matter of law, failure to exercise ordinary care.

The testimony of Mr. Schmidt upon which the city relies in asking for a reversal of the judgment here contained many inconsistencies and conflicted with known physical facts. He testified he had never seen the metal cover installed after the accident, although he policed the area every day. He stated in a deposition that when

---

[3] Wis J I—Civil 8020:

"An (owner) (occupant-possessor) is not a guarantor of the safety of invitees who come upon his premises. He is not required to discover dangers which are not discoverable through the exercise of ordinary care. He is not required to warn an invitee upon his premises of a dangerous condition which is open, unconcealed, and obvious. He need not call attention to a danger which is known to and understood by the invitee. But if the dangerous condition is not open, unconcealed, or obvious, but rather one which an invitee, exercising ordinary care, would not be expected to discover, then it is the duty of the owner to warn the invitee of such dangerous condition. A failure so to warn is a failure to exercise ordinary care."

[4] "§343 A. Known or Obvious Dangers

"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

the first asphalt cover fell through, he had fitted a wooden cover into a "ledge" in the hole, which ledge none of the other witnesses nor the photographs reveal. He first claimed that such wooden cover remained until after the accident, but at the trial he testified that this wooden cover had been replaced by the second asphalt one before the accident, and that such asphalt cover remained in place during and after Treps' accident. The trial court found Mr. Schmidt's testimony incredible as a matter of law. We agree.

The city also contends that the evidence does not support the jury's verdict that Mr. Treps was not contributorily negligent. For the same reasons that the city was negligent—the foreseeable danger that persons using the parking lot as an athletic facility could not be reasonably expected to discover the hole—we find the evidence ample to support the jury's finding.

Finally, the city argues that the court's finding, that the city was negligent as a matter of law, unduly influenced the jury's verdict on contributory negligence. This court has repeatedly held that a cautionary instruction is sufficient to rebut any unfair implication from the court's finding. *Crowder v. Milwaukee & Suburban Transport Co.* (1968), 39 Wis. 2d 499, 508, 159 N. W. 2d 723. The city failed to request such an instruction in the present case, and has waived any objection at the appellate level.

*By the Court.*—Judgment affirmed.