RUPPA, Individually and as personal Representative of Estate of Doctor Rex Ruppa, Deceased, Plaintiff-Appellant, v. AMERICAN STATES INSURANCE COMPANY, and others, Defendants-Respondents.†

Supreme Court

No. 77–022.   Argued September 10, 1979.—Decided October 9, 1979.
(Also reported in 284 N.W.2d 318.)

† Motion for reconsideration denied, with costs, on December 12, 1979.

630

632

For the appellant there were briefs and oral argument by *Edward Rudolph* of Milwaukee.

For the respondents there was a brief by *Boardman, Suhr, Curry & Field; Frank M. Coyne; Ross & Stevens; W. J. Stern; Wightman, Thurow & Sauthoff; Winner, McCallum & Hendee; Axley, Brynelson, Herrick & Gehl;* and *Bell, Metzner & Seibold,* all of Madison; *Brennan, Steil, Ryan, Basting & MacDougall* of Janesville; and

*Paul E. Vos,* of Mitchellville, Iowa; with oral argument by *Harry Sauthoff* and *Claude J. Covelli,* both of Madison.

For the Madison Saddle Club there was a reply brief by *Frank M. Coyne* of Madison, and oral argument by *Michael Cassidy* of Madison.

For American States Insurance Company there was a brief by *Robert R. Studt* and *Jenswold, Studt, Hanson, Clark & Kaufmann* of Madison, and oral argument by *Robert R. Studt.*

BEILFUSS, C.J. The accident that gave rise to the wrongful death action occurred on August 2, 1973, during the Madison Imperial Horse Show conducted on the Dane County Exposition grounds. Most of the events took place in a building called the Coliseum. However, the accident in question occurred in the building called the Arena. Dr. Rex Ruppa entered an event called "cutting." Cutting is the separating of one animal from a herd of cattle. This exercise requires a well-trained horse. Dr. Ruppa, an experienced horseman, owned such a horse and used it in this contest. While participating in the event the horse slipped and fell, severely injuring Dr. Ruppa. He died of those injuries about six months later.

The named defendants are as follows: (1) Dane County and its insurer, Federal Insurance Company; (2) Roy Gumtow and Marvin Peterson, the county employees who managed the Dane County Arena and Exposition grounds; (3) George Holmes, Gordon Volz, Mrs. Jesse Nelson, Thomas Caine, and Maurice Klinke, all officers and/or members of the Madison Saddle Club; (4) the Madison Saddle Club, a nonstock, nonprofit corporation which sponsored the Madison Imperial Horse Show; and (5) Harold Brite and Basil "Buck" Johnson, the two

judges employed by the Madison Saddle Club to officiate at the Madison Imperial Horse Show.[1]

The complaint alleges that the death of Dr. Ruppa was caused by the negligence of all of the defendants (excepting the insurers) in their failure to provide and maintain a safe and suitable place for the horse show in breach of their duties under common law, the Wisconsin safe-place statute, and the lease agreement between the Madison Saddle Club and Dane County.

The Madison Imperial Horse Show was an annual event put on by the Madison Saddle Club. The club itself was an organization of between 25 and 35 members who paid dues of $10 per year. The main purpose of the club was to bring people together who had a mutual interest in horses.

The defendant Nelson, the secretary of the club, testified in a discovery deposition that this interest was manifested in the annual horse show put on by the club and that there were few other activities they engaged in. She further testified that although the horse show had not been financially successful in recent years (the club lost $9,000 on it in 1973), it had been in the past and deficits were paid out of the surplus that they had accumulated. During the years when the show had provided income, the profits were either distributed to charities or kept in reserve for future shows. At no time did any of the members of the Saddle Club receive any of the proceeds of the show, nor were they compensated for the time and effort they devoted to putting on the show.

In 1973, as in previous years, the Dane County Exposition grounds were leased for the horse show. Gordon Volz and Jesse Nelson signed the lease as president and secretary of the Madison Saddle Club. Under the provi-

---

[1] The Madison Imperial Horse Show was also named as a defendant. This name designates only the event sponsored by the Madison Saddle Club. There is no business entity called the Madison Imperial Horse Show.

sions of the lease the Madison Saddle Club agreed to "so conduct its activities upon the premises as not to endanger any person lawfully thereon." The lease also provided that a dirt or clay covering would be installed by the county over the concrete floor base. Once the show began, however, floor care was to be the responsibility of the Madison Saddle Club.

The "cutting" event had first been included as part of the Madison Imperial Horse Show in 1972 upon the recommendation of defendant George Holmes. When it was decided to again include a cutting event in the 1973 show, Holmes took the initiative in making the necessary arrangements. The cutting event was held in the Arena. Most of the other events were held in the Coliseum. Defendant Volz, in a discovery deposition, testified that George Holmes took charge of the show at the Arena and that the major responsibility for any of the physical accommodations pertaining to the cutting contest was his. Holmes was in the Arena announcing the event when Dr. Ruppa's accident occurred.

Dr. Ruppa was required to sign and did sign an "entry blank" as a condition of entering the horse show. Directly over Dr. Ruppa's signature is a paragraph designed "Owner's Statement, Name, Agent, Address, Assumption and Release of Liability." That paragraph reads as follows:

"I, as owner and/or exhibitor of the horse(s), equipment, product(s) or goods hereby entered by me in the Madison Imperial Horse Show, do hereby, in consideration of the acceptance of this entry, covenant and agree to be personally liable for any and all injury, damage or loss caused by or resulting from the presence, use or operation of any animal(s), vehicle(s), equipment, product(s) or goods owned and/or exhibited by me at said show. I do further hereby covenant and agree that the sponsors of the Madison Imperial Horse Show shall not under any circumstances be liable or responsible for any injury, damage or loss to any person, animal, vehicle,

building, fixture or any other property, caused by or resulting from the presence, use or operation of any animal(s), vehicle(s), equipment, product(s) or goods owned and/or exhibited by me at said show.

"I hereby certify that every horse, rider and/or driver is eligible as entered and agree for myself and my representatives to be bound by the constitution and rules of the American Horse Shows Association and this show."

On the basis of this language, all of the defendants moved for and were granted summary judgment. The trial court held that although "the release signed by Dr. Ruppa did not specifically identify the intended beneficiaries of the release from liability," nevertheless the language of the release was broad enough to cover all of the defendants in the action.

The trial court further ruled, in a supplemental decision on motion for summary judgment, that with respect to some of the defendants there were additional grounds on which to grant the motion. The court held the defendant American States Insurance Company was also entitled to summary judgment because the policy issued by it to the Madison Saddle Club did not provide coverage for liability for Dr. Ruppa's injury. The court also held that defendants Volz, Nelson, Holmes, Caine and Klinke could not be found personally liable because of their status as members of the Saddle Club, a corporate entity.

The principal issue is whether the terms of the "Assumption and Release of Liability" are sufficient to relieve all of the defendants of liability.

The release signed by Dr. Ruppa constitutes a contract. Dr. Ruppa signed it in consideration of the acceptance of his entry into the horse show. A contract is to be so construed as to give effect to the intention of the

parties.[2] Any provisions which are ambiguous are to be construed against the party that drafted the contract, in this case the Madison Saddle Club. With respect to indemnity contracts,[3] such agreements will generally not be construed to cover losses caused by the indemnitee's own negligence unless such effect is clearly and unequivocally expressed in the agreement.[4]

Under the terms of the "Assumption and Release of Liability" signed by Dr. Ruppa, he agreed to be personally liable and that the sponsors of the Madison Imperial Horse Show would not under any circumstances be liable or responsible for any injury, damage or loss "caused by or resulting from the presence, use or operation of any animal(s), vehicle(s), equipment, product(s) or goods owned and/or exhibited" by him at the show. However, the complaint alleges that Dr. Ruppa's injuries were caused by and resulted from the negligent failure of the defendants to provide and maintain a safe place for the presentation of the cutting event. The appellant seeks to recover for injury and death caused by and resulting from the allegedly defective condition of the floor of the arena, property owned or under the control of the defendants. Dr. Ruppa did not sign an agreement to assume liability or release anyone from liability for injury caused by or resulting from the negligence of another or from the condition of another or from liability for injury caused by or resulting from the condition of any property other than his own. While the Madison Saddle

---

[2] *Allstate Ins. Co. v. Truck Ins. Exchange,* 63 Wis.2d 148, 216 N.W.2d 205 (1974); *Goebel v. First Federal Savings & Loan Asso.,* 83 Wis.2d 668, 266 N.W.2d 352 (1978).

[3] The paragraph contained in the entry blank contains two provisions: the first is to indemnify and the second is to release.

[4] 15 Williston, *Contracts,* p. 143, sec. 1750A; *Young v. Anaconda American Brass Co.,* 43 Wis.2d 36, 168 N.W.2d 112 (1969); *Algrem v. Nowlan,* 37 Wis.2d 70, 154 N.W.2d 217 (1967).

Club and its officers may have intended the release to protect it from liability for its own negligence, the terms of the release do not accomplish that result.

Another difficulty with the release is that it fails to specifically identify who the parties are that are released from liability. It states merely that the sponsors are released. The appellant points out in her brief that the program contained a list of sponsors of the horse show and that none of the defendants were included in that list. In fact, the list is a collection of local businesses and individuals who evidently contributed to the show.

Webster's New World Dictionary, p. 1376, defines "sponsor" as "a person or agency that undertakes certain responsibilities in connection with some other person or some group or activity, as in being a proponent, endorser, adviser, underwriter, surety, etc." Using this definition the Madison Saddle Club would be covered by the release, and possibly its officers and agents. However, neither Dane County and its employees, nor the two judges hired by the Saddle Club could be considered sponsors of the Madison Imperial Horse Show in this sense of the word.

Thus, we conclude that Dr. Ruppa, in signing the entry form released only the Madison Saddle Club from liability for injury, damage or loss to himself or others "caused by or resulting from" the presence, use or operation of his property. Because the complaint alleges and appellant contends that her husband's death was caused by and resulted from the condition of property owned by or under the control of the defendants or their negligence, a factual question exists to be resolved by trial.

Because we have concluded the release does not relieve all the defendants from liability, we do not reach the question as to whether the release is void as being contrary to public policy.

The appellant's contention that the question of the applicability of the safe-place statute is not properly before the court is without merit. She herself has raised the question on this appeal and it is clearly a question of law.

Turning then to the question of the statute's applicability, it should first be noted that the safe-place statute applies to both places of employment and public buildings. This court has consistently held that in order to constitute a place of employment under sec. 101.01(2)(a), Stats., a building must be used for a profit-making enterprise. Institutions operated by nonprofit or governmental organizations are not places of employment.[5]

Under this line of cases the Dane County Arena could not be considered a place of employment under the statute. Neither Dane County nor the Madison Saddle Club were conducting their activities for profit.[6]

Nevertheless, the Dane County Arena is a "public building" under sec. 101.01(2)(h), Stats., and both Dane County and the Madison Saddle Club would be considered "owners" under 101.01(2)(i). Thus the Wisconsin safe-place statute would apply.[7]

Although the duty of an owner of a public building is less strict under sec. 101.11, Stats., than that of an em-

[5] *See Rogers v. Oconomowoc,* 24 Wis.2d 308, 128 N.W.2d 640 (1964); *Waldman v. Young Men's Christian Asso.,* 227 Wis. 43, 277 N.W. 632 (1938); *Voeltzke v. Kenosha Memorial Hospital,* 45 Wis. 2d 271, 172 N.W.2d 673 (1969).

[6] But *see Mennetti v. West Side Businessmen's Asso.,* 246 Wis. 586, 18 N.W.2d 487 (1945), in which the court found that a stage set up by a nonprofit association for entertainment purposes at a harvest fair was a place of employment. *See also* 59 Op. Atty. Gen. (1970) 41 for criticism of this finding.

[7] *Flynn v. Chippewa County,* 244 Wis. 455, 12 N.W.2d 683 (1944).

ployer or owner of a place of employment, the appellant's factual allegations do state a safe-place cause of action. An owner of a public building is liable only for injury resulting from structural defects and unsafe conditions associated with structure.[8]

Pursuant to its lease agreement with Dane County, the Madison Saddle Club obtained public and liability and property damage insurance to be in force during the horse show. The policy was issued to Madison Imperial Horse Show for the period from August 2, 1973 to August 5, 1973. The total premium was $127. In the space for the premises or operation covered by the insurance was designated by the typed words—"Horse Show."

There were also two endorsements to the policy. The first stated:

"It is agreed that the policy excludes:
"(1) any loss or expense arising out of
" . . .
"(c) pony or animal rides,
" . . .
"(e) rodeos
"(2) bodily injury to or death of any person while practicing for or participating in any contest or exhibition;

unless such hazard is specifically described in the policy."

The second endorsement read as follows:

"It is agreed that the insurance under this policy does not apply to *bodily injury* to any person while practicing for or participating in any contest or exhibition of an athletic or sports nature sponsored by the *named insured.*"

On the basis of these endorsements, the trial court ruled that defendant American States Insurance Company was entitled to summary judgment upon the additional ground

---

[8] *Niedfelt v. Joint School Dist.*, 23 Wis.2d 641, 127 N.W.2d 800 (1964).

that its policy excluded coverage for the injury suffered by the deceased. The trial court concluded a horse show is not a specifically described hazard and therefore the injury resulting from participation in the "cutting" contest would remain excluded under the first endorsement. The court also held that the cutting event was "a contest or exhibition of an athletic or sports nature," and thus coverage was also excluded under the second endorsement.

The appellant contends that the policy is ambiguous and should be construed against the drafter. The ambiguity appellant sees in the policy is in the general statement of coverage and the specific exclusions. The general statement of coverage reads as follows:

"1. The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of
"Coverage A. *bodily injury* or
"Coverage B. *property damage*

to which this insurance applies, caused by an *occurrence* and arising out of the ownership, maintenance or use of the *insured premises* and all operations necessary or incidental thereto, . . ."

The appellant argues that while this language would extend coverage to participants in the cutting contest the specific endorsements withdraw it.

The answer to this argument is, of course, the endorsements do. That is, after all, what the exclusion was intended to accomplish. "When an insurance company writes an exclusion in a liability policy it intends to limit or exclude a risk." *Garriguenc v. Love*, 67 Wis.2d 130, 135, 226 N.W.2d 414 (1975). If that which it wants to exclude is not covered by the policy in the first place, then there is no reason to add a specific exclusion. It is

well established that when general and specific provisions are in conflict, the specific provision is to prevail.[9]

In a reply brief to the brief of American States Insurance Company, defendant Madison Saddle Club raises additional arguments in favor of coverage. The Saddle Club argues first that the final line of the first endorsement completely negates the above exclusions. This line qualifies those exclusions by stating that they do not apply to hazards specifically described in the policy. The defendant Saddle Club argues that decedent was injured while participating in a horse show and that "horse show" is a specifically described hazard in the policy.

The decedent, however, was injured while participating in a more specifically defined "cutting contest." Although the cutting event was held as part of the horse show, it was not specifically described in the policy.

In any event, coverage was also excluded under the second endorsement because decedent was injured "while practicing for or participating in [a] contest or exhibition of an athletic or sports nature sponsored by the *named insured.*" This exclusion was not limited to hazards not specifically described in the policy. Thus it applies.

Defendant Saddle Club argues that the cutting contest was not an athletic event within the common understanding of that term. It is simply an event, it contends, in which the horse, not the rider, is judged on its ability to separate cows from a herd.

Defendant Holmes, however, testified that a two-and-a-half minute time limit is used in the event and at least two cows must be separated within that time, more if possible. The rider, he stated, is to cut the cow out orig-

---

[9] *Goldmann Trust v. Goldmann,* 26 Wis.2d 141, 148, 131 N.W.2d 902 (1965).

inally, and then the horse is allowed to separate it completely and keep it separated.

Webster's Third International Dictionary, p. 2206, defines "sport" as "a particular play, game, or mode of amusement: as (1) : a diversion of the field (as fowling, hunting, fishing, racing, or athletic games)." In light of this definition we conclude that a cutting contest, as described in the record, is a sporting event. Injuries sustained while participating in such events were excluded from coverage. Summary judgment as to American States was properly granted.

None of the individual members of the Saddle Club owed a duty to appellant's decedent under the safe-place statute. Although the statutory definition of "owner" of a public building appears broad enough to include agents or representatives of the club who may have been in actual custody or control of the building (sec. 101.01 (2) (i)), this court has consistently refused to construe the statute to apply to agents or supervisory personnel of the principal owner or employer.[10]

Because the individual members of the club cannot be liable under the safe-place statute, their liability, if any, must arise under common law. Under common law an owner or occupier of land owes one lawfully on the premises a duty of ordinary care.[11] If one of the Saddle Club members could be considered an owner or occupier of land it is possible that the allegedly defective condition of

---

[10] *See Wasley v. Kosmatka,* 50 Wis.2d 738, 184 N.W.2d 821 (1971), and *Anderson v. Green Bay Hockey, Inc.,* 56 Wis.2d 763, 203 N.W.2d 79 (1973).

[11] *Pitrowski v. Taylor,* 55 Wis.2d 615, 627–28, 201 N.W.2d 52 (1972); *Treps v. Racine,* 73 Wis.2d 611, 243 N.W.2d 520 (1976).

the arena floor may have constituted a breach of his common-law duty. Of the club members named as defendants, only George Holmes could conceivably have owed the decedent a duty of ordinary care.[12] For only Holmes was in the arena at the time of the accident and was in any position to control and supervise the event in which Dr. Ruppa was injured. Thus, of the Saddle Club members named as defendants, only Holmes could possibly be directly liable.

Appellant's attempts to extend liability vicariously to the other members and officers of the Saddle Club are without merit. No satisfactory reason has been presented as to why this court should disregard the corporate status of the Madison Saddle Club and find its members individually liable for whatever tort liability it may have. As this court stated in *Jonas v. State*, 19 Wis.2d 638, 644, 121 N.W.2d 235 (1963) :

"A corporation is treated as an entity separate from its stockholder or stockholders under all ordinary circumstances. Although courts have made exceptions under some circumstances, this has been done where applying the corporate fiction 'would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim.' Those who are responsible for the existence of the corporation are, in those situations, prevented from using its separate existence to accomplish an unconscionable result."

In *Anderson v. Abbott*, 321 U.S. 349 (1944), the United States Supreme Court stated that limited liability for

---

[12] Jesse Nelson testified that defendant Thomas Caine was appointed to the Grounds Committee and was in charge of maintaining the arena floor. Caine testified, however, that he had no knowledge of this appointment and did not assume responsibility for the arena floor. He was not present at the time of the accident and received no compensation. Thus there is no basis upon which to find any duty he had owing to the decedent.

members of a corporation is the rule, not the exception. Exceptions to that general rule were made, said the court, when public policy demand it, when fraud was involved, and when there was an obvious inadequacy of capital, "measured by the nature and magnitude of the corporate undertaking." *Supra* at 362.

None of the circumstances justifying the exception is present here. Public policy does not require the individual liability of the members and no fraud has been alleged. The defendant Saddle Club also contracted for liability insurance which under the circumstances and from past history it had every reason to believe would be adequate. In all of the years in which the Madison Saddle Club had held the show there had never been a serious injury.

The appellant argues that the corporate veil should be ignored because of the informal manner in which its officers conducted business. The club had no regular meeting place. Its mail was received at the secretary's place of employment and its only asset was a bank account. This does not constitute grounds, however, for disregarding the corporate status of the club.

Appellant's contention that the Saddle Club members were engaged in a joint venture for profit, we conclude, is without merit. There are four elements to a joint venture: (1) contribution of money or services by each of the parties; (2) joint proprietorship and mutual control over the subject matter of the venture; (3) an agreement to share profits; and (4) an express or implied contract establishing the relationship. *Edlebeck v. Hooten*, 20 Wis.2d 83, 88, 121 N.W.2d 240 (1963). In this case the third element is absent. The uncontested affidavits of the defendant members of the Saddle Club

state that none of them received any of the proceeds of the show. None of them were paid for their services. The income received by the club was either donated to charity or used for future shows. Any distribution by a nonprofit corporation to its members is in violation of sec. 181.02(4), Stats. Although a member's horse might increase in value if it were successful, none of the defendants sold horses for profit.

In conclusion, there would seem to be no basis upon which defendants Nelson, Volz, Caine or Klinke could be found personally liable for the death of Dr. Ruppa. With respect to defendant George Holmes, assuming he was in control and supervising the "cutting" event at the time the accident occurred as alleged, he owed a duty of ordinary care in conducting the event so that participants would not be injured. Whether he exercised such care is a question of fact and should not be determined upon a motion for summary judgment.

The appellant also contends that regardless of the effect of the release on any claim Dr. Ruppa might have had against the defendants, it is totally ineffective with respect to her action because the decedent had no capacity to bind his beneficiaries to any agreement affecting their rights under the wrongful death statute. Under sec. 895.03, Stats., an action for wrongful death is derivative. One is liable to the plaintiff in an action under that statute only if and to the extent that he would have been liable to the decedent had death not ensued. In *Haase v. Employers Mut. Liability Ins. Co.*, 250 Wis. 422, 433, 27 N.W.2d 468 (1947), this court explained the statute as follows:

"By the use of the words therein 'and the act, neglect or default is such as would, *if death had not ensued,* have entitled the party injured to maintain an action. . . in re-

spect thereof,' the right to recover thereunder is definitely limited to solely cases in which the injured party could have recovered if his death had not ensued."

*By the Court.*—Judgment affirmed as to American States Insurance Company, Jesse Nelson, Gordon Volz, Thomas Caine and Maurice Klinke; judgment reversed as to all other defendants-respondents and remanded for further proceedings not inconsistent with this opinion.

ABRAHAMSON, J., took no part.