STATE FARM FIRE & CASUALTY COMPANY, Plaintiff-Appellant, v. HOME INSURANCE COMPANY, Defendant-Respondent.

Court of Appeals

*No. 78-234. Submitted on briefs January 17, 1979.—
Decided February 8, 1979.*
(Also reported in 276 N.W.2d 349.)

For the plaintiff-appellant, the cause was submitted on the brief of *Barbara A. Kluka* and *Eugene A. Gasiorkiewicz* of *Schoone, McManus & Hanson, S.C.* of Racine.

For the defendant-respondent, the cause was submitted on the brief of *Craig W. Nelson* of the *Law Offices of Ronald L. Piette* of Milwaukee.

Before Moser, P.J., Brown, J., and Bode, J.

This case concerns the validity of an exculpatory clause contained in an apartment lease.

In October, 1974 Charlotte Kirsch and her son moved into a ground floor apartment located in Burlington,

Wisconsin. The apartment building was owned by Manuel Mendez who employed Lawrence Middleton to act as caretaker. Kirsch occupied the apartment for one month before she was required to sign a one-year lease on November 7, 1974. The lease contained an exculpatory clause which stated, in part, that the "[l]essor . . . shall not be liable for any damage done or occasioned by or from plumbing, gas, water, steam or other pipes, . . . in, above, upon or about said building or premises . . . ." At the time the lease was signed, Kirsch neither read this clause nor had its terms explained to her.

The apartment Kirsch leased contained an air conditioning sleeve into which an air conditioning unit could be placed. The sleeve did not, however, contain such a unit. Instead, there was a piece of cardboard covering the opening where the appliance would normally have been.

The apartment directly above Kirsch's was leased and occupied by Lex Hickman and Dennis Cramer in November. The air conditioning sleeve in their apartment was in a condition similar to that of the sleeve in the Kirsch apartment. That is, there was no air conditioning unit or cover for the exterior opening of the sleeve, and only a piece of cardboard covered the interior opening.

Hickman testified that a constant draft came through the air conditioning sleeve and that between November, 1974 and February, 1975, Middleton had received upwards of fifty complaints from Cramer and him about the problem. He further testified that Middleton had been told that the cardboard kept blowing off the sleeve and that they had stuffed newspaper, a blanket, and various items of clothing into the sleeve in an effort to provide some insulation. During this period, Middleton did nothing to correct the problem.

Kirsch was at work on February 2, 1975 when she received a call asking her to return to her apartment.

Upon arriving, she found some of her belongings outside and water coming through the apartment ceiling. Al Clausen, a journeyman plumber, was called to the Hickman-Cramer apartment where he found a broken copper tube in the baseboard radiation unit. Clausen observed that the air conditioning sleeve, located about eight inches above the heating element, was not properly insulated. He later testified that, in his opinion, the break in the copper tubing was caused by the cold air coming through the sleeve being forced downward onto the tubing by the warmer air in the apartment, thereby causing the tube to freeze and break.

As a result of water leaking through her ceiling from the apartment above, Kirsch sustained $1,646.24 in damages to her personal property. That amount was paid to her by her insurer, State Farm Fire and Casualty Company, which received the right to her claim by subrogation. State Farm received $155.00 in salvage, thereby sustaining a net loss of $1,491.24.

State Farm brought suit against Home Insurance Company, Mendez' liability insurer, seeking to recover that amount. A jury trial was held on April 25, 1978, at the conclusion of which the jury found in favor of State Farm. Home Insurance moved for judgment notwithstanding the verdict. The motion was granted and judgment entered in accordance therewith on June 7, 1978. State Farm appeals.

BODE, J. The issue before us is whether the exculpatory clause in the lease was valid and enforceable. State Farm advances two arguments by which it seeks to avoid the application of the clause.

In its first argument, State Farm alleges that the clause was invalid because of the circumstances surrounding the execution of the lease. It admits that exculpatory clauses have generally been held valid based on broad public policy principles and the freedom to

contract found in federal and state constitutions. *Queen Ins. Co. of America v. Kaiser,* 27 Wis.2d 571, 574, 135 N.W.2d 247, 248–49 (1965). However, based on *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis.2d 514, 241 N.W.2d 174 (1976), it submits that there are exceptions to holding such clauses valid and that this situation falls within the exception found where the parties are in unequal bargaining positions.

In *College Mobile Home,* the court stated that where a determination on the validity of an exculpatory clause in a residential lease must be made, the factors to be considered include:

> the circumstances under which the lease was negotiated, including the type of lease involved—whether a standard form or an individualized contract—the type of housing which the lease covers, the relative positions of the parties at the time the lease was entered into, and the scope of the exculpatory language. *College Mobile Home,* 72 Wis.2d at 521, 241 N.W.2d at 177.

State Farm contends Kirsch possessed unequal bargaining power when she signed the lease because she had already lived in the apartment for a month before she was required to either sign the lease or vacate. At this point, State Farm maintains, it would have been very inconvenient for her to have had to move again. Furthermore, State Farm says the lease was a standard form and the terms were never explained to Kirsch. We do not think these factors placed Kirsch in an unequal bargaining position. Nor do we believe this is the type of situation for which the exception was created.

As previously stated, the theory behind the rule upholding exculpatory clauses is freedom to contract and the idea that lease terms are purely private. In refusing to deem exculpatory clauses valid in all situations, the court in *College Mobile Home* indicated that the underlying theory may not be tenable in all situations. That

is, since standardized forms are often used in residential leases, the exculpatory clause is no longer really private, and in some cases the freedom to contract may be nothing more than an illusion. For these reasons, the court stated that before finding an exculpatory clause valid, both the clause itself and the circumstances surrounding the creation of the landlord-tenant relationship should be examined to ascertain if the principles behind the rule hold true. We have undertaken such an examination in this case and conclude that neither the clause nor the factual context of the lease arrangement required deviation from the general rule.

Kirsch was free to sign the lease or to move elsewhere. There is no evidence that alternative apartments were not available or that she could not afford a different unit. She was not placed in a position of either signing or having no place to go. Moreover, there is no indication that the lease requirement came as a surprise to her. The general tone of her testimony on this point was that she knew a lease was required but that one was not available until a month after she moved in. We are likewise unmoved by the fact that the terms of the lease were not explained to her. If a prospective tenant is illiterate, unable to read English, or for some other reason unable to comprehend the written terms of a lease, there may be an obligation on the part of a landlord to explain them. However, that is not the case here. Kirsch testified that the exculpatory clause in question was "relatively easy to understand" but that she simply had not read it before the accident occurred. To hold an unambiguous portion of a contract invalid simply because it was not read would be ludicrous. Failure to read a contract before signing it will generally not affect its validity. A court will not protect a person who fails to take reasonable steps for his own protection. *See Stan-*

*dard Mfg. Co. v. Slot,* 121 Wis. 14, 24, 98 N.W. 923, 926–27 (1904) ; 17 Am. Jur. 2d *Contracts* §149 (1964). We conclude that Kirsch was not placed in an unequal bargaining position. Therefore, the exculpatory clause was valid.

The second argument advanced by State Farm is that the exculpatory clause may not be enforced in this case because the damage resulted from the active negligence of the landlord.

The general rule is that an exculpatory clause exempting a landlord from liability resulting from a condition of the premises does not apply where the damage sustained is caused by the active or affirmative negligence of the landlord. *Queen Ins.,* 27 Wis.2d at 576, 135 N.W.2d at 250 ; 49 Am. Jur. 2d *Landlord and Tenant* §869 (1970).

*Queen Ins.* was a case in which the Wisconsin Supreme Court examined an exculpatory clause virtually identical to the instant one. In distinguishing between active and passive negligence, the court relied on what is now 65 C.J.S. *Negligence* §1(14) (1966) where the terms were defined as follows:

"[A]ctive negligence," . . . denotes some positive act or some failure in a duty of operation which is the equivalent of a positive act, . . . . "Passive negligence" denotes the failure to do something that should have been done; . . . .

The court then concluded that "passive negligence, as distinguished from active negligence, will not invalidate the exculpatory clause of the lease under consideration . . . ." *Queen Ins.,* 27 Wis.2d at 577, 135 N.W.2d at 250.

With these principles to guide us, the sole task remaining is to determine if the negligence attributed to Middleton by the jury was active or passive. Home Insurance maintains that the negligence was by definition

passive because Middleton simply failed to do something which should have been done. We disagree.

Middleton's actions did not amount to mere inadvertent acts of omission as did those of the negligent party in *Queen Ins*. Hickman and Cramer had repeatedly brought the lack of insulation in the air conditioning sleeve to Middleton's attention. His intentional failure to take action to correct the defect under the circumstances was an affirmative act constituting active negligence. Having concluded that Middleton's negligence was active, the exculpatory clause may not be used to exempt Mendez from liability and the motion for judgment notwithstanding the verdict should have been denied.

*By the Court.*—Judgment reversed and case remanded for entry of judgment on the verdict.