Ralph C. DYKSTRA and Sandra Dykstra, his wife, Plaintiffs-Respondents,

v.

ARTHUR G. MCKEE & COMPANY, a foreign corporation, and Jetco Properties, Inc., a Delaware corporation, Defendants and Third-Party Plaintiffs-Appellants,

J. F. AHERN COMPANY, a Wisconsin corporation, Third-Party Defendant-Appellant-Petitioner.

Supreme Court

*No. 77-513. Argued October 27, 1980.—Decided February 2, 1981.*

(Also reported in 301 N.W.2d 201.)

For the petitioner there was a brief by *Tom E. Hayes, Edward A. Hannan* and *Hayes & Hayes* of Milwaukee, and oral argument by *Tom E. Hayes.*

For defendant and third-party plaintiff there were briefs by *James P. O'Neill, Douglass J. Carroll* and *Arnold, Murray, O'Neill & Schimmel* of Milwaukee, and oral argument by *James P. O'Neill.*

HEFFERNAN, J. This is a review of a decision of the court of appeals,[1] which affirmed a judgment of the Circuit Court for Dodge County, Henry G. Gergen, Jr., Circuit Judge.

The principal question on this review is whether an indemnity contract which purports to indemnify a wholly negligent indemnitee for a violation of the safe place statute under circumstances where the indemnitor is

---

[1] *Dykstra v. Arthur G. McKee & Co.,* 92 Wis.2d 17, 284 N.W.2d 692 (Ct. App. 1979).

totally free of negligence is contrary to public policy. We conclude that such a contract of indemnity is valid; and, accordingly, we affirm.

The petitioner on this review is J. F. Ahern Co. Ahern was a subcontractor, hired to do plumbing and refrigeration work on a building being constructed by the general contractor, Arthur G. McKee & Co. As a part of the subcontract, McKee and Ahern entered into an indemnification agreement, which McKee contends requires Ahern to indemnify it, McKee, for any injuries or damages which arise in connection with the performance of the subcontract, although Ahern were found to be completely free of negligence and McKee were found to be wholly negligent.

On August 16, 1972, Ralph Dykstra, who was a steamfitter employed by Ahern, sustained a disabling knee injury when he fell in a partially completed corridor in a building under construction by McKee. Dykstra, as a consequence of the injuries sustained at that time, brought an action against the McKee Co., alleging that he was a frequenter of a place of employment under the control of McKee and that McKee violated the safe place statute (sec. 101.11, Stats.) in that it failed to do what was reasonably necessary to protect the life, health, safety, and welfare of frequenters and failed to keep and maintain the place of employment safe. McKee then joined Dykstra's employer, Ahern, as a third-party defendant, seeking indemnification for damages under the provisions of the contract between McKee and Ahern. Jetco, the owner, was also joined as a party defendant subsequent to the filing of the original complaint.

The trial record shows that the corridor in the partially completed building was a major thoroughfare which was used by the several subcontractors and their employees. It was about five feet wide and 25 to 30

feet long. The floor was smooth, highly finished concrete. Although the exterior walls of the building had been erected, the roofing of the building had not been completed. The evidence adduced at trial showed that it had rained frequently for several days before the accident and that conditions of high humidity prevailed and that rain water from roof apertures fell into the corridor. There was evidence that the floor was moist with condensation and that it was slippery.

The question of McKee's negligence was tried to a jury, which found that McKee was 80 percent negligent and that Dykstra was 20 percent negligent. Following the trial by jury, McKee's indemnification action against Ahern was tried to the court. After trial, the court found the indemnity agreement to require that Ahern indemnify McKee in the amount of $134,679.55, the amount of Dykstra's judgment against McKee.

On appeal to the court of appeals, McKee and Jetco contended that the jury's verdict could not be sustained because the evidence was insufficient. Ahern also appealed on the grounds of the insufficiency of evidence to show a violation of the safe place statute and also contended, assuming *arguendo* that there had been a violation of the safe place statute, that the indemnification agreement on its face did not require it to indemnify McKee under the circumstances of this case and, in any event, were the agreement construed to require indemnification, the agreement was void and contrary to public policy as an unlawful attempt to delegate McKee's nondelegable safe place duties.

The court of appeals found the evidence sufficient to hold McKee liable for the violation of the safe place statute, and upheld the trial court's conclusion that the indemnification agreement covered the facts of this case, was not against public policy, and required Ahern to indemnify McKee. According to the record and in-

formation gleaned from the parties' briefs and at oral argument, Dykstra's judgment has been paid by McKee. Ahern, however, has petitioned this court for review of the court of appeals' decision holding that the indemnification agreement is applicable to the facts of this case and is not contrary to public policy. There is no issue before this court in respect to the underlying liability of any of the parties to Dykstra, the injured workman. The sufficiency of the evidence necessary to support a safe place violation is not an issue on this review.

The indemnification agreement entered into between McKee and Ahern as a part of the subcontract provided:

*"INDEMNIFICATION* You shall assume liability for, be responsible for, indemnify (and at our request, defend), and save harmless ourselves, and anyone (including our customers) to whom we may be liable by contract or otherwise, against any loss, damage, or expense arising from any actual or claimed death or actual or claimed injury to any person, or actual or claimed damage to property, whether owned by you, ourselves or third parties, including loss of use, which actually or allegedly results from, or actually or allegedly arises in connection with, the performance of this subcontract, (including any such injury, death, or damage caused in part by our negligence) unless you can prove by clear and convincing evidence that such death, injury, damage, or loss of use was caused solely by our active negligence and that you were at all times diligently trying to minimize the possibility of such death, damage, or loss of use and, if such occurred, the consequences thereof."

In *Spivey v. Great Atlantic & Pacific Tea Co.,* 79 Wis. 2d 58, 63, 255 N.W.2d 469 (1977), we recapitulated the rules applicable to the construction of indemnification agreements. Therein we said:

"The general rule accepted in this state and elsewhere is that an indemnification agreement will not be construed to cover an indemnitee for his own negligent acts

absent a specific and express statement in the agreement to that effect."

We pointed out in *Spivey* that an indemnity contract which agreed to indemnify a party against its own negligence is not against public policy, but that we would not so construe a contract unless it is apparent that such result was clearly intended.

In *Bialas v. Portage County*, 70 Wis.2d 910, 912, 236 N.W.2d 18 (1975), we said:

"Such agreements are liberally construed when they deal with the negligence of the indemnitor, but are strictly construed when the indemnitee seeks to be indemnified for his own negligence."

In *Spivey, supra,* we nevertheless pointed out that this rule of "strict construction . . . cannot be used to defeat the clear intent of the parties." (P. 63) We said:

"If the agreement clearly states that the indemnitee is to be covered for losses occasioned by his own negligent acts, the indemnitee may recover under the contract. Additionally, if it is clear that the purpose and unmistakable intent of the parties in entering into the contract was for no other reason than to cover losses occasioned by the indemnitee's own negligence, indemnification may be afforded." (PP. 63–4)

An indemnification contract must be strictly construed to determine whether it is indeed the intent of the parties that a negligent indemnitee be indemnified for its own negligent conduct. Once that determination is made, however, as *Spivey* points out, the remaining provisions of the contract are not subject to rules of strict construction. Instead, their meaning is to be determined on the basis of ordinary contract construction rules.

Even applying the rules of strict construction, it can hardly be argued that the intent of the parties to this

agreement was not to indemnify McKee, although it, the indemnitee, was negligent. Initially, the contract provides that Ahern is liable for indemnification, although the damage or injury was partially the result of McKee's negligence. In addition to requiring indemnity where part of the negligence was McKee's, the agreement also imposes on Ahern the obligation to indemnify even where the injury is "caused solely by our [McKee's] active negligence" if Ahern could not prove that it was "diligently trying to minimize the possibility" of such damages and the consequences thereof.

To state the clear meaning of the latter clause of the contract somewhat differently—no indemnity was to be owed in the event the injuries were caused solely by McKee's active negligence *and* Ahern tried to minimize the possibility of such injuries. In view of the express provisions of the indemnity agreement, it is unnecessary to give strict construction to the agreement to find that it was the clear purpose of the parties to indemnify McKee for its own negligence. It is apparent that this was precisely what the agreement required. Once that express intent has been determined, and a strict construction, if necessary, supports that clear intent, the remainder of the contract is not subject to the rule of strict construction.

Ahern on this review does not initially contend that the agreement may not be construed to find a clear intent that McKee be indemnified for its own negligence. Rather, the focus on this review appears to be on the phrase of the contract which provides that the injury be one that "allegedly arises in connection with[ ] the performance of this subcontract." Ahern asserts that the phrase, "in connection with[ ] the performance of the subcontract," should, in accordance with the rule of strict construction, be given the most restrictive meaning possible. In view of the discussion above, this view

is in error, because we are concerned not with whether it is the intent of the indemnitor to indemnify an indemnitee for its own negligence, but rather we are concerned with the question of under what circumstances and facts that clear intent shall apply. Only a reasonable construction is necessary and, indeed, appropriate.

Moreover, Ahern would have us only define the word, "performance." Thus, under its view, Ahern's "performance" could only mean the special expertise required under the contract in respect to the special skill and trade of a steamfitter or a plumbing and heating specialist. Walking to and fro to get to, or depart from, the steamfitting job site, Ahern correctly asserts, does not require that special expertise or performance. To adopt Ahern's reasoning, however, makes surplusage of the words, "in connection with"[2] and the contract provides that there is liability for injuries which arise "in connection with" the performance of the subcontract. Obviously, "performance," when so modified, is broader in meaning and encompasses more than the word, "performance," alone. It is clear from the face of the contract itself that it is not just "performance" of a contract, as defined by Ahern, that triggers liability. The phrase, when interpreted reasonably, means conduct and action ancillary to the actual steamfitting or plumbing procedures.

In view of the facts here, where it is undisputed that Dykstra, with his foreman, walked from one part of the construction site to a nearby part of the site to pick up materials on the job, it would be unreasonable and contrary to the intent of the contract terms to conclude that

[2] Construction of contracts resulting in surplusage is to be avoided. *Jones v. Jenkins*, 88 Wis.2d 712, 722, 277 N.W.2d 815 (1979); *Goebel v. First Fed. Savings & Loan Asso.*, 83 Wis.2d 668, 680, 266 N.W.2d 352 (1978).

the injury from the fall in the corridor did not arise in connection with the performance of the subcontract.

Ahern also attempts to put still another twist on the word, "performance." It states:

"[B]ecause 'performance' entails the installation of plumbing which, in turn, entails the exercise of dominion and control, the contract clearly requires that Ahern have actual control over the place of injury at the time of injury."

Starting with this premise, Ahern points out that no plumbing work was actually being performed in the corridor where the injury took place and, therefore, Ahern could not have had actual control. As pointed out above, this interpretation relies on the narrowest meaning of the word, "performance," and makes surplusage the phrase, "in connection with." Furthermore, there is nothing whatsoever in the agreement to indicate that it was the intent of the parties that indemnification for injuries would lie only in respect to areas over which Ahern and not just McKee had some control or right of control. Even were we to adopt a rule of strict construction, which we conclude is not applicable to this portion of the agreement, Ahern seeks more than a strict construction of the agreement—it seeks that the court read into the contract a provision not present. There is no provision in the agreement that suggests any intent to ameliorate or qualify the terms of Ahern's indemnity obligation by limiting it to places or situations where it had some physical control over the premises. Ahern's linguistic interpretation of "in connection with[ ] the performance of this subcontract" is imaginative, but because it makes surplusage a portion of the phrase and seeks to inject a condition left out of the agreement, it is not persuasive as to the reasonable meaning of that portion of the contract. We conclude

that the injury in the corridor arose in connection with the performance of the subcontract and that, under the terms of the contract, it is irrelevant that Ahern had no control over the immediate premises.

Additionally, it should be noted, in a situation such as this, where it is undisputed for the purposes of the indemnification agreement that the injury was caused solely by the active negligence of McKee,[3] that Ahern could be relieved of its indemnity obligation only if it at all times diligently tried to minimize the possibility of injury. It is thus at least arguable that in the circumstances here, where Ahern was just as aware as McKee of the slippery conditions of the floor, that it had a duty under the indemnification agreement to minimize the hazards of the slippery floor if it wished to avoid the consequences of its agreement. Some responsibility was given to Ahern to minimize chances of injury even when only McKee was negligent. This is a duty of joint control. It is admitted, however, that Ahern did nothing in that respect. We accordingly conclude, as strictly construed, that this agreement obliged Ahern to indemnify McKee for McKee's negligence; and we also conclude that the contract, as reasonably construed, contemplated that the fall which Dykstra sustained while going for tools for his steamfitter's work was an injury sustained in connection with the performance of the subcontract. There is nothing in the contract which intimates that the liability of McKee is to be triggered only in areas in which it had actual independent or joint control of the injury site. The trial court and the court of appeals properly construed

[3] Neither party argues that the trial court erred in considering that the 20 percent contributory negligence of the injured worker, plaintiff Dykstra, vis-a-vis defendant McKee, is immaterial to the comparison of negligence between Ahern and McKee for purposes of the indemnification agreement.

the contract to apply to the circumstances of Dykstra's injury.

It is argued, however, by Ahern that, although the contract on its face be applicable, it is contrary to public policy, because it permits the general contractor to avoid the nondelegable duties that are imposed upon him by the safe place statute. It is contended, therefore, that this indemnification agreement is void as being against public policy.[4] Because the contract does not delegate McKee's safe place duty to Ahern, we find that argument totally unconvincing.

It is, of course, clear that the duty of an owner or employer under the safe place statute is nondelegable.

[4] Ahern invited the court of appeals' attention to sec. 895.47, Stats., enacted by ch. 441, Laws of 1977:

"895.47 **Certain agreements to limit or eliminate tort liability void.** (1) Any provision to limit or eliminate tort liability as a part of or in connection with any contract, covenant or agreement relating to the construction, alteration, repair or maintenance of a building, structure, or other work related to construction, including any moving, demolition or excavation, is against public policy and void.

"(2) This section does not apply to any insurance contract or worker's compensation plan.

"(3) This section shall not apply to any provision of any contract, covenant or agreement entered into prior to July 1, 1978."

The court of appeals correctly pointed out that this statute does not apply to the contract herein, which was executed on June 8, 1972. Accordingly, the effect of the statute is not before us. We note in passing, however, that it does not appear that this statute necessarily outlaws indemnity agreements of the kind with which this opinion is concerned. A brief resort to the legislative history reveals that reference to agreements "to indemnify" which appeared in Rep. Hauke's bill request to the Legislative Reference Library did not appear in the act as passed by the legislature. The question whether this act intends to outlaw certain indemnity agreements or whether it intends only to forbid contracts which anticipatorily extinguish causes of action for tort is not appropriate for resolution in this opinion.

To recite this maxim, however, is not explanatory of its meaning. Ahern in this case contends that it means that the ultimate financial liability for damages occasioned by the violation of the safe place statute must rest upon the party who violates the safe place statute. Ahern contends, therefore, that the financial exoneration of McKee, who had the statutory safe place duty, violates public policy. We conclude, however, that this shifting of responsibility through either the principles of common law indemnity or contractual indemnity is not what is meant by the statement that the duties under the safe place statute are nondelegable. A good example of an unsuccessful attempt to delegate safe place statute duties is found in *Bunce v. Grand & Sixth Building, Inc.*, 206 Wis. 100, 238 N.W. 867 (1931). In that case a plaintiff who fell in the toilet room of a theater brought safe place action against the building owner. One basis for the building owner's defense was that it had no liability because it had hired an admittedly competent architect, and under the state laws an architect was required to plan construction of public buildings so as to render them safe. This court, however, in answer to that argument, pointed out:

"[T]he duty of rendering the place safe is primarily and positively placed on the owner, and that he procures an architect does not relieve him from his obligation in that regard." (P. 103)

This principle is akin to the common law rule which imputes to a master the negligence of his employees. This court in *Driscoll v. Allis-Chalmers Co.*, 144 Wis. 451, 129 N.W. 401 (1911), in reciting the common law rule, said:

"The duty of defendant to furnish a reasonably safe working place being absolute, if such duty be delegated by the master to another, negligence in that regard by such other will be imputed to the master." (P. 460)

Another case at the common law to the same effect is *Eingartner v. The Illinois Steel Co.*, 94 Wis. 70, 68 N.W. 664 (1896). Therein the court said at page 79:

"When the master undertakes to furnish the servant a place to work, with the preparation of which place the servant has nothing to do, then it is the master's duty to furnish a reasonably safe place to work, and this duty cannot be delegated; and the servant who prepares such place for work is not, in the eye of the law, a fellow-servant with the other."

See also *Zulkee v. Wing*, 20 Wis. 429, *408 (1866), which pointed out that, although an employer under the common law was responsible for a safe place of employment and must answer in damages for a breach of that duty, he could recover the loss from a third party (in that case a servant) who had made the place of employment unsafe.

It is apparent from these early cases that the duty of an owner or employer to keep the premises safe under both the common law and the safe place statute had nothing to do with his right to financial recoupment from another party either by operation of law or by contract. All that is meant by the statement that duties under the safe place statute are nondelegable is that the person who has that duty cannot assert that another to whom he has allegedly delegated the duty is to be substituted as the primary defendant in his stead for a violation of safe place provisions. Under any circumstance, it is the owner or the employer who must answer to the injured party. Whether that owner or employer is to be made financially whole from another source by principles of law or contract is an entirely different question. It is clear in the instant case that McKee assumed its full duties under the safe place statute in respect to the injured steamfitter Dykstra, and McKee was held responsible in Dykstra's action

against it for the violation of those duties. As the record on appeal shows, McKee has paid the judgment which Dykstra recovered.

With respect to any employees or frequenters on the premises, vis-a-vis McKee, there has been no attempt to shift responsibility for the statutory tort. It is only in respect to Ahern, whose rights in this action do not arise under the safe place statute, that McKee has asserted contractual rights to be made whole as a result of the injuries. We do not see this situation as an attempt by McKee to delegate its safe place duties. No doubt, McKee, as a reasonable contractor and business corporation, also carried separate insurance to protect itself against safe place claims. The fact that it alternatively or additionally contractually arranged with Ahern to financially make it whole does not constitute a shift of safe place duties any more than would an initial purchase of insurance for the same purpose.

This general problem was addressed some years ago by Dean Robert F. Boden in an article appearing in Volume 40, Marquette Law Review, page 349, *The Problem of Indemnity under the Safe Place Statute.* Dean Boden, in reviewing cases of this court decided at the time of the article, said:

"The [Wisconsin Supreme Court] has . . . ruled that indemnity insurance contracts are not void as against public policy on the theory that they encourage negligent conduct by relieving the actor of personal liability." (P. 366)

Boden then went on to point out that, even in situations where the negligence of the indemnitee was active and that of the indemnitor merely passive, and by inference in situations where the indemnitor was free of negligence:[5]

---

[5] It should be noted that "active" and "passive" in describing negligence have not been retained in Wisconsin's jurisprudential

"[I]t is felt by this writer that if a case comes to the Court, it will be inclined to adopt the majority rule and give validity to the contract. Any other result, it is submitted, necessarily is based upon the proposition that it is against public policy to insure against one's own negligence. Such a proposition is today untenable. . . ." (PP. 366–67)

It should also be pointed out that, although no cases heretofore have come before this court concerning the contractual obligation of a nonnegligent indemnitor to indemnify a wholly negligent indemnitee, we see no difference in the principle there involved and in cases that have come before this court in which indemnity contracts involving partially negligent indemnitees have been upheld.

In *Baker v. McDel Corp.*, 53 Wis.2d 71, 191 N.W.2d 846 (1971), the general contractor was held to have appropriately ceded its financial liability to a subcontractor although the general contractor was 80 percent negligent and the subcontractor 15 percent negligent. In principle, we conclude that *Baker* stands for the proposition that an indemnity contract which makes whole the negligent contractor at the expense of the nonnegligent party neither contravenes the delegability of the safe place statute nor unconscionably rewards a negligent party at the expense of one who has used due care.

Ahern additionally argues that the provision of the indemnity contract requiring the subcontractor to minimize the possibility of the occurrence of injury and its consequences, particularly in an area that was not directly under Ahern's control, required Ahern to assume McKee's safe place statute duties and would also accomplish a delegation of nondelegable safe place responsibilities. We think this argument runs counter to the

nomenclature. *Barrons v. J. H. Findorff & Sons, Inc.*, 89 Wis.2d 444, 458–59, 278 N.W.2d 827 (1979); *Pachowitz v. Milwaukee & Suburban Transport Corp.*, 56 Wis.2d 383, 202 N.W.2d 268 (1972).

facts of the case and the general law in respect to safe place responsibilities. The duty under the safe place statute is untouched by this contractual provision. As stated in the discussion above, the duty under the statute remains fixed upon those who are statutorily liable —the owner or employer. The provision in respect to the minimization of the chance for injury constitutes not a shift in statutory duties but a shift in the contractual obligation under the indemnity agreement where the facts show the negligence is wholly the active negligence of McKee and where Ahern diligently tried to minimize the possibility of injury and its consequences. This contractual provision, like all the others in the indemnity agreement, has nothing whatsoever to do with McKee's obligation under the safe place statute.

■

We accordingly conclude that the indemnity agreement, properly construed, is applicable to the facts of this case, that the agreement is not contrary to public policy as being violative of the safe place statute, and that the fact that, under the express terms of this contract, a nonnegligent party is obliged to indemnify a wholly negligent party does not void the indemnity agreement. This indemnity agreement was part of the consideration for the contract for plumbing and heating which Ahern entered into with the general contractor McKee. While the risks to which Ahern exposed itself when it made this agreement are substantial, there is no argument that the subcontract of which this agreement was a part was unfair or unconscionable. The indemnity agreement proposed by McKee was accepted by Ahern in the exercise of its business judgment. Because we find that the contract is applicable to the situation here and is not contrary to public policy, the parties are bound by their agreement.

*By the Court.*—Decision affirmed.

COFFEY, J., took no part.