Bonnie MERTEN, Plaintiff-Appellant-Petitioner,

v.

Kerry NATHAN, Peter Nathan, Burgundy Ridge Farms, Inc., and Illinois Employers Insurance of Wausau, Defendants-Respondents.

Supreme Court

*No. 80–1663. Argued April 27, 1982.—Decided July 2, 1982.*

(Also reported in 321 N.W.2d 173.)

206

For the plaintiff-petitioner there was a brief (in court of appeals) and a reply brief (in this court) by *Robert C. Angermeier* and *Angermeier & Rogers* of Milwaukee, and oral argument by *Robert C. Angermeier*.

For the defendants-respondents there was a brief (in this court) by *Hamilton T. Hoyt, James P. Samster* and *Hoyt, Greene & Meissner, S.C.*, of Milwaukee, and oral argument by *Hamilton T. Hoyt*.

SHIRLEY S. ABRAHAMSON, J. This is a review of an unpublished decision of the court of appeals filed on July 8, 1981, affirming a judgment of the circuit court for Ozaukee county, Charles L. Larson, reserve Circuit Judge. Bonnie Merten, the plaintiff, brought an action for personal injuries suffered while taking a horseback-riding lesson at Burgundy Ridge Farms. The circuit court granted summary judgment to all defendants, holding that the exculpatory contract signed by the plaintiff relieved the defendants from liability arising from injuries incurred by the plaintiff during a riding

lesson. The court of appeals affirmed the judgment of the circuit court. We reverse.

In this court, as in the circuit court and the court of appeals, the plaintiff attacks the validity of the exculpatory contract. Although many facts relating to the incident causing the injury are contested, the facts relevant to our determination of the validity of the exculpatory contract are undisputed.

The plaintiff, Bonnie Merten, had never ridden a horse before communicating with the defendant Kerry Nathan, an instructor at Burgundy Ridge Farms (also a defendant), to arrange for riding lessons. After the first lesson, a private one largely for evaluation purposes, the plaintiff signed a five-paragraph exculpatory contract titled "EQUESTRIAN RELEASE OF ALL CLAIMS."[1] While there appears to be some dispute as

---

[1] The full text of the Exculpatory contract is as follows:

EQUESTRIAN RELEASE OF ALL CLAIMS

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, being of lawful age, desires to participate in equestrian activities on property at the Burgundy Ridge Farms, Inc. The undersigned acknowledges that there are dangers and risks of injury inherent in these equestrian activities, but still desires to participate in these activities.

THEREFORE, the undersigned, for and in consideration of the opportunity to participate in these equestrian activities and for other good and valuable consideration, *does hereby forever release, acquit and forever discharge Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton, their employees, agents and all other persons, corporations, associations, or partnerships from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever which the undersigned may hereinafter incur on account of, or in any way growing out of, any and all known or unknown, foreseen or unforeseen bodily and personal injuries and/or property damage or the consequences thereof resulting from any accident, casualty or event involving the undersigned and arising out of equestrian activities.*

to when the exculpatory contract was signed, it is undisputed that the contract was executed prior to the incident in which the injury occurred.

The third paragraph of the exculpatory contract, and the key provision for purposes of this review, reads as follows:

"IT IS EXPRESSLY UNDERSTOOD by the undersigned that Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton, have no insurance covering equestrian activities and that the undersigned would not be permitted to engage in equestrian activities without this release whereby the undersigned irregardless of fault, agrees to fully release Burgundy Ridge

IT IS EXPRESSLY UNDERSTOOD by the undersigned that Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton, *have no insurance covering equestrian activities and that the undersigned would not be permitted to engage in equestrian activities without this release whereby the undersigned irregardless of fault, agrees to fully release Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton and their employees and agents from any and all responsibility as a result of accident or injury.*

FURTHER AND BY WAY OF INDEMNITY the undersigned hereby expressly understands and agrees to indemnify and save harmless Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton, their employees and agents, against any and all further claims or damages, costs or expenses incurred by Burgundy Ridge Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton, their employees and agents, as a result of any accident or injury which might occur while the undersigned is engaging in equestrian activities and which may result from the negligence of the undersigned, Peter W. Nathan, Joseph and Kathleen Patton, Burgundy Ridge Farms, Inc., their employees or agents, third parties or any combination thereof.

The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned and that this release contains the entire agreement between the parties hereto and that the terms of this release are contractual and not a mere recital.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT. (Emphasis added.)

Farms, Inc., Peter W. Nathan, Joseph and Kathleen Patton and their employees and agents from any and all responsibility as a result of accident or injury."

After the injury, the plaintiff learned that, contrary to the representation set forth in the exculpatory contract quoted above, Burgundy Ridge Farms did have a liability insurance policy which covers injuries plaintiff received during her equestrian activities.

The defendant Burgundy Ridge had begun using the "equestrian release of all claims" at a time when it was uninsured. Prior to the execution of the instant exculpatory contract, Burgundy Ridge purchased a liability policy with limits of $300,000 per occurrence which apparently covers risks from which defendants sought release under the exculpatory contract. Nevertheless the defendants continued to use the exculpatory contract. Defendant Peter Nathan, president of Burgundy Ridge, testified that the premium ($3,120) was paid from the general receipts of the business which included fees from riding lessons.

In their answer to the complaint, the defendants, including the insurer, Illinois Employers Insurance of Wausau, raised the exculpatory contract as an affirmative defense and moved for summary judgment. The circuit court granted defendant's motion for summary judgment, and the court of appeals affirmed. The court of appeals concluded that the exculpatory contract in this case did not fall within any of the categories of exculpatory contracts void on grounds of public policy and that the elements of fraudulent misrepresentation were not proved.[2]

[2] The elements of fraudulent misrepresentation rendering a contract voidable are: (1) there must be a statement of fact which is untrue; (2) the false statement must be made with intent to defraud and for the purpose of inducing the other party to act upon it; and (3) the other party must rely on the false statement and must be induced thereby to act to his injury or damage. The court of appeals held on a motion for summary judgment that there was

Moreover the court of appeals refused to hold that instructors of dangerous sports cannot shift the risk to the participant unless the exculpatory contract particularizes the risks to be shifted.

The sole issue before this court is whether the exculpatory contract bars plaintiff's recovery. The plaintiff urges us to hold that exculpatory contracts, that is, contracts which relieve a party from liability for harm caused by his or her own negligence, are void as contrary to public policy.[3] In the alternative the plaintiff asks us to declare the exculpatory contract in the instant case unenforceable. Because we conclude that the instant contract is unenforceable, we do not reach the broader question of the validity of exculpatory contracts in general.

Although many jurisdictions have held exculpatory contracts valid, it is well accepted that such contracts

---

no indication in the pleadings, the affidavits or the depositions that the plaintiff relied on the false statement and that she had been induced to act on the basis of the false statement.

We have recognized that even honest misrepresentation is grounds for rescission of a contract because " 'it would be unjust to allow one who has made false representations, even innocently, to retain the fruits of a bargain induced by such representation.' " *Whipp v. Iverson*, 43 Wis. 2d 166, 171, 168 N.W.2d 201 (1969), quoting *Williston on Contracts* sec. 1500, p. 4189 (1937). See also, *First National Bank & Trust Co. v. Notte*, 97 Wis. 2d 207, 293 N.W.2d 530 (1980); Restatement (Second) of Contracts sec. 164 (1979).

Because we hold the exculpatory contract invalid on other grounds, we need not reach the question of whether either innocent or fraudulent misrepresentation or mutual mistake of fact exists and whether the issue of the plaintiff's reliance can be decided in this case on a motion for summary judgment.

[3] Plaintiff, citing *Ruppa v. American States Ins. Co.*, 91 Wis. 2d 628, 638, 284 N.W.2d 318 (1979), asserts that this court has never directly ruled on the validity of exculpatory contracts. In *Ruppa* this court expressly stated it would not reach the question of whether a release relieving defendants of liability is void as being contrary to public policy.

are not favored by the law, that such contracts are to be construed strictly against the party seeking to rely on them, 6A *Corbin on Contracts* sec. 1472, p. 602 (1962), 15 *Williston on Contracts* sec. 1705A (3d ed. Jaeger, 1972), and that courts examine the facts and circumstances of each exculpatory contract with special care to determine whether enforcement of the exculpatory contract in the individual case contravenes public policy, *College Mobile Home Park & Sales v. Hoffmann*, 72 Wis. 2d 514, 519, 520, 241 N.W.2d 174 (1976).[4] This view toward exculpatory contracts reflects the courts' accommodation between principles of contract law and tort law.

The law of contracts is based on the principle of freedom of contract, on the principle that individuals should have the power to govern their own affairs without governmental interference. The courts protect each party to a contract by ensuring that the promises will be performed. The law protects justifiable expectations and the security of transactions.

The law of torts is directed toward compensation of individuals for injuries sustained as the result of the unreasonable conduct of another. Tort law also serves the "prophylactic" purpose of preventing future harm; pay-

---

[4] For previous cases dealing with exculpatory contracts, see, *e.g., Queen Ins. Co. of America v. Kaiser*, 27 Wis. 2d 571, 575, 135 N.W.2d 247 (1965) (exculpatory clause in a lease); *College Mobile Home Park & Sales v. Hoffmann*, 72 Wis. 2d 514, 516, 241 N.W.2d 174 (1976) (exculpatory clause in a lease); *State Farm Fire & Casualty Co. v. Home Ins. Co.*, 88 Wis. 2d 124, 128, 276 N.W.2d 349 (Ct. App. 1979) (exculpatory clause in a lease); *Arnold v. Shawano County Agr. Society*, 106 Wis. 2d 464, 317 N.W.2d 161 (Ct. App. 1982), petition for review granted May 3, 1982 (exculpatory contract dealing with participation in an automobile race). See also, *Dykstra v. McKee & Co.*, 100 Wis. 2d 120, 301 N.W.2d 201 (1981), and cases cited therein, holding an indemnity contract indemnifying a party against its own negligence is not void as against public policy.

ment of damages provides a strong incentive to prevent the occurrence of harm.

Adherence to principles of contract law would generally lead a court to enforce an exculpatory agreement without passing on the substance of the agreement.[5] Adherence to principles of tort law would tend to make a court reluctant to allow parties to shift by contract the burden of negligent conduct from the actor to the victim who has no actual control or responsibility for the conduct causing the injury. The rules governing exculpatory contracts reflect the uneasy balance between these principles of contract and tort law.

The court of appeals described four situations in which exculpatory contracts have been declared void on public policy grounds: a contract arises out of a business generally thought suitable for public regulation; the party seeking exculpation is engaged in performing a service of great importance to the public; the party seeking exculpation holds itself out as willing to give reasonable public service to all who apply; and the party invoking exculpation possesses a decisive advantage of bargaining strength.

The Restatement (Second) of Contracts sets forth the following situations in which exculpatory contracts are unenforceable on grounds of public policy:

"(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

"(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

---

[5] "[I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." *Baltimore & Ohio Sw. R. Co. v. Voight,* 176 U.S. 498, 505 (1900). See Pound, *Liberty of Contract,* 18 Yale L.J. 454 (1909).

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

"(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability." Sec. 195, Restatement (Second) of Contracts (1979).

The exculpatory contract in the instant case does not fall within any of the categories of exculpatory contracts violating public policy set forth in the decision of the court of appeals or in the Restatement (Second) of Contracts. These categories, however, are not intended as an exhaustive list of situations in which exculpatory contracts are unenforceable on the grounds of public policy. Comments *a* and *b*, sec. 195, Restatement (Second) of Contracts, p. 66 (1979). Public policy is a broad, not easily defined concept. It embodies the community common sense and common conscience. Public policy is "that principle of law under which freedom of contract or private dealings is restricted by law for the good of the community." *Higgins v. McFarland*, 196 Va 889, 86 S.E. 2d 168, 172 (1955).

We are presented in this case with an exculpatory contract which includes a misstatement of fact by the party seeking the release. The fact misstated goes to the essence of the contract, that is, how and why the risks of loss are to be shifted from the prospective negligent actor to the victim. The language of the exculpatory contract in the instant case clearly ties the nonexistence of insurance to the requirement that persons who wish to

ride release the defendants from liability. The message conveyed to any reasonable reader by the statement that the defendants "have no insurance covering equestrian activities" is clear. The defendants were explaining why a prospective student would have to bear the risk of any injury. The defendants were telling the prospective student: "We do not have insurance to cover your injuries. If you want to ride, you must exempt us from liability so that we do not face possible financial ruin." But the explanation was false. A truthful statement would be that the defendants have insurance coverage and that there would be no or limited effect on the defendants if they bore the risk of loss. There can be no question that a statement that the defendants have no insurance protection is highly relevant to a reasonable student's decision to sign a contract which allocates to the student the losses arising out of equestrian activities.

When the party seeking an exculpatory contract includes in the contract a false statement about a fact which is relevant to a reasonable person's decision whether to execute a release allocating losses, the principles of contract law do not weigh heavily in favor of enforcement of the exculpatory contract, and the goals of tort law weigh against enforcement of the exculpatory contract. Freedom of contract is premised on a bargain freely and voluntarily made through a process of bargaining which has integrity. If we were to enforce an exculpatory contract based on a false statement of fact relevant to a reasonable person's decision whether to execute the release, we would open the door to sharp practice. Misstatements by the party seeking the release raise the strong suspicion of inequitable motive and overreaching and of lack of good faith or fair dealing on the part of the party seeking the release and of oppression of the party executing the release. Even though all the elements of misrepresentation or mistake cannot be proved in a

case involving an exculpatory contract (and in this case more specifically, defendants assert that the plaintiff cannot prove she relied on their misrepresentation), relief should be granted from an exculpatory contract when the probability of unfairness exists. In view of the public policies of protecting free and voluntary bargaining and of imposing liability on persons whose conduct creates an unreasonable risk of harm, we conclude that it would be contrary to public policy to enforce an exculpatory contract when the bargaining process involves a mistake or deception which is relevant to a reasonable person's decision to execute a release allocating losses. Accordingly we hold that the exculpatory contract in the instant case is unenforceable.

We reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

*By the Court.*—Decision of the court of appeals reversed; judgment of the circuit court reversed and cause remanded to the circuit court for further proceedings not inconsistent with this opinion.

WILLIAM G. CALLOW, J. *(dissenting)*. The majority concludes: (1) The inclusion of the words "IT IS EXPRESSLY UNDERSTOOD . . . [that the defendants] *have no insurance covering equestrian activities*" is a misstatement of fact going to the essence of the exculpatory contract in the instant case, *supra*, at 207, and that (2) public policy renders such an exculpatory contract unenforceable. *Supra*, at 215. I disagree that the above-referenced words go to the essence of the contract. Further, I do not believe that the exculpatory contract in the instant case is violative of public policy as I understand the law in this area. Accordingly, I dissent.

Turning to the majority's first conclusion, for which it cites no authority—that the defendants' misstatement

concerning insurance coverage was highly relevant and went to the essence of the bargain between the parties— I find, following a thorough review of the record and the release agreement, that the misstatement had little, if any, effect upon Bonnie Merten. It certainly was not, as the majority appears to characterize it, a condition precedent to the signing of the contract.

In the first paragraph of the release it states: "The undersigned acknowledges that there are dangers and risks of injury inherent in these equestrian activities, but still desires to participate in these activities." The immediately succeeding "THEREFORE" clause states: "THEREFORE, the undersigned, . . . does hereby forever release . . . [the defendants] from any accident . . . arising out of equestrian activities." Clearly, as I read the contract, the release of liability was in response to the nature of the activity the plaintiff desired to pursue.

I agree with the following conclusion reached by the court of appeals:

"There is no indication, either in the pleadings or the affidavits and depositions, that the [insurance] recital was a material fact upon which Merten relied. She admitted reading the release before signing it; she understood it and even questioned Kerry Nathan about it. Kerry Nathan said the release meant the stable was not legally responsible for any negligence. Merten said she understood that she was 'releasing Burgundy Ridge Farms from any responsibility.' *With respect to the recital that the stable had no insurance, she said that when she first read this, 'it bothered me, but I signed it anyway.' There is no allegation that she signed the release because of or in reliance on the recital."* (Emphasis added.)

The majority concludes that "[e]ven though all the elements of misrepresentation . . . cannot be proved in a case involving an exculpatory contract . . . , relief should be granted from an exculpatory contract when the probability of unfairness exists." *Supra,* at 215.

This broad statement takes great license with the law, and the majority has not shown any evidence of unfairness in the instant case.

"The elements of fraudulent misrepresentation are well established in the case law: First, there must be a false representation; second, it must be made with intent to defraud and for the purpose of inducing another to act upon it; and third, such other person must rely on it and be induced to act, to his injury or damage."

*Goerke v. Vojvodich*, 67 Wis. 2d 102, 107, 226 N.W.2d 211, 214 (1975). In my review of this case, Bonnie Merten has not proven elements two and three of this tort. The majority apparently believes that she does not have to prove these elements if an exculpatory contract is involved and the concomitant probability of unfairness exists. The majority opines that enforcing an exculpatory contract which contains a false statement of fact "open[s] the door to sharp practice." I submit this is the very reason the tort of misrepresentation evolved. Simply because the plaintiff cannot meet its well-established elements is no reason for this court to carve out an exception in the case of exculpatory contracts.[1]

---

[1] The majority states it would grant relief in cases where "the probability of unfairness exists." *Supra*, at 215. Where there is is no evidence that the insurance statement was made with any intent to induce the signing of the contract and where the plaintiff did not rely upon the disclaimer in so contracting, I question whether unfairness exists. The majority apparently believes Bonnie Merten would not have signed the contract had she known of the existence of the insurance. *Supra* at 214. However, I know of no duty to disclose the existence of an insurance policy, and in fact, I doubt such disclosure is customary practice with any contract—particularly an exculpatory contract. While the majority may see disclosure as desirable to a potential plaintiff, it is not the law.

As I read the majority opinion, had the contract been silent regarding the issue of insurance, it would have been upheld. But because the defendants had the misfortune to use their standard

I would stress that, absent a statute to the contrary, the generally accepted rule is that contracts against liability for negligence are valid except in those cases where a public interest is involved. 57 Am. Jur. 2d *Negligence* sec. 23, 366 (1971) ; W. Prosser, *Handbook of The Law of Torts,* sec. 68, 442 (4th ed. Hornbook Series 1971) ; 2 Restatement (Second) of *Contracts* sec. 195, 65 (1981) ; Restatement of *The Law of Contracts* sec. 575, 1080–81 (1932) ; 15 *Williston on Contracts* sec. 1750A, 141–46 (3d ed. Jaeger, 1972). *See also Abel Holding Co., Inc. v. American District Telegraph Co.,* 138 N.J. Super. 137, 153–54, 350 A2d 292 (1975). "The justification for upholding the validity of such clauses stems from the concept of freedom of contract, grounded in state and federal constitutional provisions." *College Mobile Home Park & Sales, Inc. v. Hoffmann,* 72 Wis. 2d 514, 516–17, 241 N.W.2d 174 (1976). *See Queen Insurance Company of America v. Kaiser,* 27 Wis. 2d 571, 575, 135 N.W.2d 247 (1965) (exculpatory clauses are not uncommon and are a proper subject of the bargain of the parties). While the majority is correct in stating that exculpatory clauses should be strictly construed against the drafter in cases of ambiguity, the contract in the instant case is not am-

---

form, drafted prior to the acquisition of insurance, which the plaintiff did not rely upon, the majority has imposed liability. I submit the defendants' actions should be scrutinized under the well-established tort of misrepresentation, not the new variety designed by the majority under facts it finds unfair.

An exculpatory contract exempting a landlord from liability resulting from a condition on the premises does not apply if the damage is attributable to the landlord's *active* negligence. *Queen Insurance Company of America v. Kaiser,* 27 Wis. 2d 571, 576, 135 N.W.2d 247 (1965). In the instant case, I see the defendants' actions as *passive* negligence. They inadvertently omitted removing the six words regarding insurance in the exculpatory clause in a contract. By way of analogy, I note that passive negligence is insufficient to nullify an otherwise valid exculpatory clause in a lease. *Id.* at 577.

biguous, and the strict construction rule is inapplicable because the intent of the parties is clear. *See Johnson v. Prange-Geussenhainer Co.*, 240 Wis. 363, 375, 2 N.W.2d 723 (1942) (rule of strict construction should not be invoked to defeat clear intent of the parties). Exculpatory contracts have not been statutorily prohibited in this state, and I believe this court should endeavor to uphold them when they result in a bargained for exchange and do not violate public policy. "The mere fact that a contract is somewhat harsh or unfair in its operation does not excuse performance, and the court cannot create contractual obligations which are not based on the expressed intention of the parties." *Abel Holding Co., Inc. v. American District Telegraph Co.*, 138 N.J. at 155.

The court of appeals reached the following conclusions in holding that the exculpatory contract in the instant case is readily distinguishable from the following types of contracts which are violative of public policy:

"(1) The contract arises out of a business generally thought suitable for public regulation, *e.g.*, a common carrier or a public utility. *See Western Union Telegraph Co. v. Nester*, 309 U.S. 582 (1940); *Fox*, 138 Wis. at 653, 120 N.W. at 401. *Cf. Duszynski*, 32 Wis. 2d at 468, 145 N.W.2d at 738.

"(2) The party seeking exculpation is engaged in performing a service of great importance to the public, *e.g.*, places of public accommodation, such as retail stores, restaurants and the like. When such public accommodation is a matter of practical necessity for some members of the public, these businesses become subject to a public interest. *New York Central Railroad Co. v. Lockwood*, 84 U.S. (17 Wall.) 357, 378–82 (1873);

"(3) The party seeking exculpation holds itself out as willing to give reasonable public service to *all* who apply, *e.g.*, public warehousemen, common carriers and innkeepers. *See Lombard v. Louisiana*, 373 U.S. 267 (1963) (Douglas, J., concurring), and

"(4) As a result of the essential nature of the service in the economic setting of the transaction, the party in-

voking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks the services and confronts the public with a standard contract. As a result, the person is placed under the control of the seller subject to the risk of carelessness, *e.g.*, hospital-patient contracts where a member of the public, despite his or her economic inability to do so, faces the prospect of a compulsory assumption of the risk of another's negligence. *See Tunkl,* 60 Cal.2d at 102, 383 P.2d at 447, 32 Cal. Rptr. at 39." (Emphasis in original.)

*See also* W. Prosser, *supra* at sec 68, 442–44; Restatement (Second) of *Contracts, supra* at sec. 195 comment *a; supra,* at 213.

The majority, acknowledging that the instant case does *not* fall within these four well-recognized policy ambits denying enforceability, seemingly dismisses the legal parameters to unenforceability by advocating that courts define public policy using "community common sense and common conscience." Supra, at 213. The majority proceeds to shift the emphasis of its opinion to the false statement concerning the insurance policy in the exculpatory clause, holding that such a misstatement vitiates the integrity of the bargaining process, smacks of overreaching and lack of good faith, and of oppression to the party executing the release. Supra, at 214, 215.

I question what the majority's position would be if an exculpatory contract contained a misstatement that a defendant had no insurance when the agreement was signed but where the policy had lapsed at the time of the accident. Furthermore, the majority declares that, because of the existence of an insurance coverage misstatement in the contract, a defendant is not relieved from the liability excused by the terms of the contract. The liability thus imposed is not limited to the face value of the insurance policy, and accordingly a defendant would be obliged to pay that portion of a judgment which

exceeded the insurance coverage. Imposing this burden on a defendant is clearly a result contrary to the express terms of such an exculpatory contract.

Even though I believe that the misstatement in the instant case did not have a determinative effect on the parties bargained for exchange (*i.e.,* I believe the record clearly reveals that Bonnie Merten would have signed the release with or without the disclaimer of insurance), the majority's interpretation of the misrepresentation should be analyzed under the tort of misrepresentation, not expansion of the policy limitations on the enforceability of exculpatory contracts because the plaintiff fails to satisfy the requisites of the applicable tort.

I would note that exculpatory clauses are routinely inserted in contracts dealing with recreational activities, such as horseback riding.

"Sports or recreational events, whether there be actual participation or vicarious enjoyment have not as yet in any court or by any legal authority been recognized as a business or facility having a public-service character. . . . All of the above events are leisure pursuits, many of which naturally involve a certain amount of risk. In *Riding Academy v. Miller,* (1934) 127 Ohio 545, 189 N.E. 647, the court noted that a person who hires a riding horse must be prepared for the ordinary risks involved."

*Duszynski v. B & T Riding Academy, Inc.,* 32 Wis. 2d 464, 468, 145 N.W.2d 736 (1966). In the instant case Bonnie Merten desired to take riding lessons, and I believe she intended to contract away her rights and remedies for future negligence on the part of the defendants in exchange for the lessons. *See State Farm Fire & Casualty Co. v. Home Insurance Co.,* 88 Wis. 2d 124, 129, 276 N.W.2d 349 (Ct. App 1979) (lessee not in a position of either signing a contract or having no place to go). "Freedom of contract is a fundamental concept underlying the law of contracts and is an essential element of the free enterprise system." *Rawlings v. Layne*

& *Bowler Pump Company*, 93 Idaho 496, 499, 465 P2d 107, (1970). There is nothing in the facts of the case "to suggest that the parties were not on equal footing or that they did not deal at arm's length. 'There is no rule of public policy which denies effect to their expressed intention, but on the contrary, as the matter lies within the range of permissible agreement, *the highest public policy is found in the enforcement of the contract which was actually made.'*" *Sun Oil Co. v. Dalzell Towing Co., Inc.*, 287 U.S. 291, 294 (1932) (emphasis added).

The majority correctly notes that "courts [must] examine *the facts and circumstances of each exculpatory contract* with special care to determine whether enforcement of the exculpatory contract *in the individual case contravenes public policy.*" *Supra,* at 211 (emphasis added). The majority concludes that a proper judicial inquiry focuses on whether a misstatement in an exculpatory contract would be relevant to *a reasonable person* (an objective standard). I believe that, where the plaintiff in the individual case declares that the misstatement was not of consequence to him, then the reasonable person test is not applicable. I would only apply a reasonable person test when the record does not reveal the effect of the misstatement upon the individual plaintiff. Accordingly, because Bonnie Merten declared that she signed the release regardless of the insurance disclaimer, I do not believe that the exculpatory contract in the instant case was unfair or violative of public policy, and I would uphold it. *See College Mobile Home Park & Sales, Inc. v. Hoffman,* 72 Wis. 2d at 519 (courts must examine the *actual effect* of the particular release clause upon the parties).

I believe the majority errs in concluding that the misstated insurance disclaimer went to the essence of the contract and under notions of community common sense changed the bargain between the parties. I believe the

plaintiff has failed to prove a case of misrepresentation, principally because she did not rely upon the misstated insurance disclaimer in signing the contract. I, unlike the majority, would refuse to expand previously well-established public policy principles to preclude enforceability of this agreement. Accordingly, I dissent.